552 F.2d 25
 9 ERC 1641, 7 Envtl. L. Rep. 20,177
 FRIENDS OF THE EARTH et al., Plaintiffs-Appellants,
v.
Hugh CAREY et al., Defendants-Appellees,
and
Russell E. Train, Defendant.
FRIENDS OF THE EARTH et al., Petitioners,
v.
Honorable Kevin T. DUFFY, United States District Judge for
the Southern District of New York, Respondent.
 Dockets 75-7497, 76-3054.
 United States Court of Appeals,
Second Circuit.
 Submitted Nov. 1, 1976.
Decided Jan. 18, 1977.
 
 David Schoenbrod, Ross Sandler, Eric A. Goldstein, New York City, for plaintiff-appellant Natural Resources Defense Council, Inc.
 W. Bernard Richland, Corp. Counsel, New York City (Alexander Gigante, Jr., New York City, of counsel), for City defendants-appellees.
 Peter R. Taft, Asst. Atty. Gen., Edmund B. Clark, Neil T. Proto, Michael D. Graves, Attys., Dept. of Justice, Washington, D.C. (Gerald K. Gleason, Deputy Associate Gen. Counsel, E.P.A., Washington, D.C., of counsel), for defendant Russell E. Train.
 Before MANSFIELD, TIMBERS and MESKILL, Circuit Judges.
 MANSFIELD, Circuit Judge:
 
 
 1
 For the third time the Transportation Control Plan for the Metropolitan New York City Area ("the Plan"), a plan for control of that area's automobile pollution, submitted by the State of New York ("the State") to the Environmental Protection Agency ("EPA") pursuant to § 110(a)(1) of the Clean Air Amendments of 1970, 42 U.S.C. § 1857c-5(a)(1), and approved by it, is before this Court. In 1974 we upheld the validity of the Plan in all material respects, see Friends of the Earth v. EPA, 499 F.2d 1118, 1126 (2d Cir. 1974) ("Friends I "), and on April 26, 1976, we reversed a decision of the Southern District of New York denying enforcement of the Plan in a citizen suit instituted under the Clean Air Act and ordered that partial summary judgment be granted in favor of plaintiffs enforcing four strategies of the Plan,[1] as to which the defendants were admittedly in default, see Friends of the Earth v. Carey, 535 F.2d 165 (2d Cir. 1976) ("Friends II" ). We noted that the defendants' implementation of the Plan was already almost a year in default, that carbon monoxide pollution in New York City had climbed to five times the federal health standards, and that this Court could not "consistently with its duty be a party to the delaying process that has led to this situation." We ordered that consideration of the case on remand be given priority.
 
 
 2
 On April 30, 1976, Judge Kevin T. Duffy of the Southern District of New York, at first following our mandate, ordered implementation and enforcement of the four pollution-control strategies before the court and required a detailed schedule of compliance. When our attention was directed in a petition for rehearing by the City of New York ("the City") to the fact that the defendants desired to raise constitutional issues with respect to the Plan which had not previously been considered, we on June 2, 1976, denied the petition but"without prejudice to consideration by the United States District Court for the Southern District of New York of constitutional issues not decided prior to the entry of the order which was the subject of the notice of appeal . . . and without prejudice to the right of the defendants to move in the said District Court to set aside the order of the District Court dated April 30, 1976, on the aforesaid constitutional grounds."
 
 
 3
 In so ruling we did not authorize the district court to engage in reinterpretation of the Act, much less in a reinterpretation that would contradict our own prior considered construction of it or our determination as to the scope of its enforceability.
 
 
 4
 After hearing argument on the constitutional issues Judge Duffy on July 13, 1976 modified the partial summary judgment previously granted by interpreting § 304 of the Act, 42 U.S.C. § 1857h-2, as permitting enforcement of the Plan against the State or its subdivisions (including the City) only to the extent that they might be direct polluters but not as obligating them, although they were the architects and sponsors of the Plan, to implement it against others despite the fact that they had agreed to do so under the terms of the Plan and they controlled, operated, and managed the roads and facilities upon which the polluting activities by others occurred.[2] His interpretation of § 304 was based on the theory that Congressional use of the Commerce Clause to compel the City to enforce the Plan against others would violate the City's rights under the Tenth Amendment, as recently expounded by the Supreme Court in National League of Cities v. Usery, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), and by several other circuits in decisions holding that Congress may not order a state to draft an implementation plan or to enforce an EPA-promulgated plan. See Brown v. EPA, 521 F.2d 827 (9th Cir. 1975), cert. granted, 426 U.S. 904, 96 S.Ct. 2224, 48 L.Ed.2d 829 (1976); District of Columbia v. Train, 172 U.S.App.D.C. 311, 521 F.2d 971 (1975), cert. granted, 426 U.S. 904, 96 S.Ct. 2224, 48 L.Ed.2d 829 (1976); and Maryland v. EPA, 530 F.2d 215 (4th Cir. 1975), cert. granted, 426 U.S. 904, 96 S.Ct. 2224, 48 L.Ed.2d 829 (1976). Relying heavily upon these decisions, the district court all but emasculated the Plan as an enforceable instrument.
 
 
 5
 Following Judge Duffy's decision, appellants promptly moved in this Court for the recall and further modification of our April 26, 1976, mandate as it had been modified on June 2, 1976, and to vacate the district court's decision. Plaintiffs also petitioned us for a writ of mandamus against Judge Duffy, based on the claim that his decision violated our mandate and abused his discretion, which was consolidated with plaintiffs' direct appeal under 28 U.S.C. § 1291 from the district court's decision.
 
 
 6
 For the reasons that follow, we find that the district court's July 13, 1976, decision violated our mandate and abused that court's discretion. Accordingly we vacate that decision. We further direct that the district court's summary judgment of April 30, 1976, be reinstated and that such further relief be issued as is required to enforce the four strategies.
 
 
 7
 A brief review of the litigation surrounding the Plan is necessary to fully understand the issues now before us. As amended in 1970, the Clean Air Act, § 101(b)(1), 42 U.S.C. §§ 1857, et seq., contains a comprehensive regulatory scheme designed to promote public health and welfare by reducing air pollution caused by various sources controlled or regulated by the State, including motor vehicles operated on its state highways, bridges, and other facilities. Acting pursuant to the Act the Administrator of the EPA has established standards governing maximum concentrations of specific pollutants in the air. Under the Act, state and local governments assume the primary responsibility for establishing and implementing air quality control programs to meet these standards, § 107(a), 42 U.S.C. § 1857c-2(a). Section 110(a)(1) of the Act, 42 U.S.C. § 1857c-5(a)(1), requires each state to submit to the EPA a plan for "implementation, maintenance, and enforcement" of these standards, which the EPA must approve if the plan satisfies the statutory criteria, see § 110(a)(2), 42 U.S.C. § 1857c-5(a)(2). If a state fails to submit a plan or if its plan fails to meet the criteria, the EPA is obligated to prepare and promulgate a substitute plan for that state, § 110(c)(1), 42 U.S.C. § 1857c-5(c)(1), which may be enforced by the EPA.
 
 
 8
 On April 30, 1971, the EPA Administrator promulgated national primary and secondary air quality standards for six pollutants, following which each state was obligated under the Act to submit its implementation plan for these pollutants, including transportation controls necessary to attain primary air quality standards. If a state did not submit a plan of its own, it faced the promulgation and enforcement by the Administrator of an EPA-prepared plan. The State of New York, with the assistance of the Department of Air Resources of the New York City Environmental Protection Administration and other city agencies, prepared and promulgated the Plan here at issue to meet the primary standards for carbon monoxide, hydrocarbons, oxidants, and nitrogen dioxide in the New York City Metropolitan area.[3] The Plan, containing 32 specific strategies, is designed to meet "primary ambient" (outdoor surrounding air) standards and to attain "secondary ambient" standards "requisite to protect the public welfare from any known or anticipated adverse effects associated with" air pollution. The Plan was submitted to the EPA after public notice and hearings, and was approved by the EPA on June 22, 1973, with certain revisions.[4]
 
 
 9
 In 1974 some of the plaintiffs in this action sought review of the Plan pursuant to § 307(b)(1) of the Act, 42 U.S.C. § 1857h-5(b)(1), on the grounds that it was vague and inadequate and that the State had failed to provide "adequate assurances" that there would be sufficient funds to implement it. The State joined the EPA in defending the Plan, which we upheld in all substantive respects. Among other things we directed the Administrator to "provide a detailed document of his rationale" as to the basis for the EPA's determination that adequate State resources had been committed to the Plan. Friends I, 499 F.2d 1118, 1126 (2d Cir. 1974). We declined in that action to order immediate implementation of the Plan for the reason that jurisdiction in the suit rested on § 307(b)(1) of the Act, which is restricted to reviewing the correctness of the Administrator's approval of a state plan. We noted, however, that § 304 of the Act was available to citizens to bring suit in the district court to enforce implementation of the Plan in the event of the failure of the State to do so.
 
 
 10
 In Friends II, supra, the present plaintiffs brought suit pursuant to § 304 of the Act, 42 U.S.C. § 1857h-2, which provides that
 
 
 11
 "any person may commence a civil action on his own behalf (1) against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the Eleventh Amendment to the Constitution) who is alleged to be in violation of (A) an emission standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation . . . ."
 
 
 12
 The section defines the term "emission standard or limitation" to include "a schedule or timetable of compliance . . . which is in effect under this chapter . . . or under an applicable implementation plan."
 
 
 13
 We held in Friends II that the City and State were required to implement the four strategies which were before the court, concluding that after our prior review of the EPA's approval of the State-promulgated Plan it became "controlling and must be carried out by the state" and "binding upon and enforceable against state and local officials." 535 F.2d 169, 170. We examined the citizen suit provisions of the Act, § 304, and concluded that the district court could not escape enforcing the Plan on the grounds that the EPA was negotiating with the State concerning the Plan or that the task of enforcing the Plan would be unduly burdensome to administer, stating:
 
 
 14
 "The plaintiffs' right under the Act to seek such an enforcement order is beyond challenge . . . . They have fully discharged their responsibility to provide statutory notice . . . . We cannot disregard the frank statement made by New York State's Assistant Attorney General some two years ago, that this 'is a legally enforceable plan, . . . a legally adequate plan,' and that '(i)f there is a valid legal ground for . . . a refusal (to enforce the plan), we have not been able to find it. . . .' " 535 F.2d at 178-80.
 
 
 15
 We held that the district court had "abused its discretion" in "denying citizen enforcement of the lawfully established Plan," and we mandated immediate relief.
 
 
 16
 Upon remand the district court, in its decision of July 13, 1976, held that the City was not barred from advancing arguments against enforcement by the 30-day limitation of § 307(b)(1) of the Act, 42 U.S.C. § 1857h-5(b)(1), stating:
 
 
 17
 "(T)he plaintiffs mistake the nature of the City's motion. The motion does not seek to challenge the action of the Administrator in approving the (Plan); rather it challenges the interpretation of § 304 by plaintiffs and is properly raised in this proceeding. Moreover, as noted above, the Court of Appeals in its denial of the City's motion to rehear, endorsed the City's right to make the present motion."
 
 
 18
 Thus, notwithstanding our decision that the State-promulgated Plan "became binding upon and enforceable against state and local officials" through a citizen suit pursuant to § 304, the district court concluded that our mandate did not preclude it from determining "Who must enforce the plan and against whom it may be enforced." Judge Duffy then concluded that the Act did not obligate the State and its subdivisions to enforce it, even though they had prepared it, promulgated it, represented in it that the Plan would be enforced by the State and City through their agencies, and on that basis had sought and obtained EPA approval of it.
 
 
 19
 In interpreting § 304(a) of the Act, 42 U.S.C. § 1857h-2(a), as authorizing citizen suits against states and their subdivisions only for non-compliance based on their own actual pollution rather than upon their failure or refusal to enforce a state-promulgated plan, Judge Duffy reasoned that to interpret the Act as permitting a citizen or the EPA to obtain a court order requiring the State or City to enforce a state-promulgated plan approved by the EPA would pose the same constitutional hurdles as those suggested in Brown v. EPA, 521 F.2d 827 (9th Cir. 1975), cert. granted, 426 U.S. 904, 96 S.Ct. 2224, 48 L.Ed.2d 829 (1976), and District of Columbia v. Train, 172 U.S.App.D.C. 311, 521 F.2d 971 (1975), cert. granted, 426 U.S. 904, 96 S.Ct. 2224, 48 L.Ed.2d 829 (1976),[5] where the courts held that unless the Act was interpreted to preclude the federal government from imposing sanctions on a state or its officials for failure to implement or enforce EPA-promulgated anti-pollution regulations, the use of the federal commerce power to do so might violate the Tenth Amendment and the Constitution's guarantee of a republican form of government to the states, Const. Art. IV, § 4. Said the district court:
 
 
 20
 "Once a plan has been approved by the Administrator it is in the same posture as a plan which the Administrator has promulgated for the purposes of enforcement. . . .
 
 
 21
 "In view of the fact that the TCP (the Plan) was submitted by the Governor alone without any legislation and without legislative assurances, it cannot be said that any binding commitment to enforce the plan was ever made by the state. Thus, the Governor's submission was the functional equivalent of the suggestions of an interested party at hearings the Administrator might have held on his own plan."
 
 
 22
 Judge Duffy concluded that "The only option available to the Administrator when the state does not enforce a plan is to enforce the plan himself and to sue the actual polluters or violators of the plan's requirements."[6]
 
 
 23
 Appellants contend that the district court's decision and holding violate our April 26 and June 2 mandates, and is contrary to controlling legal principles. We agree.
 
 DISCUSSION
 
 24
 At the outset we face the question of whether the City has standing to claim that enforcement of the State-promulgated Plan represents an unwarranted invasion of its sovereignty in violation of the Tenth Amendment. Appellants argue that since the Tenth Amendment protects only state governments the claim may only be asserted by the State, which has not challenged the enforcement of the Plan against it, and not by the City. We disagree.
 
 
 25
 The City claims that a judgment directing it to enforce the Plan would interfere with its governmental interests in allocating funds, police resources and in making policy decisions. In its recent decision in National League of Cities v. Usery, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), the Supreme Court held that Congress is prohibited by the Tenth Amendment from using its power under the Commerce Clause to impair "attributes of sovereignty attaching to every state government" and that these attributes extend to a state's political subdivisions, including local governmental units. Said the Court: "Interference with integral governmental services provided by such subordinate arms of a state government is therefore beyond the reach of congressional power under the Commerce Clause just as if such services were provided by the State itself." Id. 826, 96 S.Ct. at 2476 n.20. The Court further made it clear that the federal Commerce Clause may not "impermissibly interfere with the integral governmental functions," which were defined to include "such areas as fire prevention, police protection, sanitation, public health, and parks and recreation." 426 U.S. 851, 96 S.Ct. 2474.
 
 
 26
 Applying these standards, the City's claim satisfies traditional notions of standing since the City is allegedly threatened with injury to its governmental interests and is within the class of entities which the Supreme Court has held to be protected from incursions of federal power. See Warth v. Seldin, 422 U.S. 490, 498-502, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Where a state has delegated to a city as one of its subdivisions the furnishing of services which constitute part of traditional governmental functions, the city has standing to raise a claim of impermissible interference with "those fundamental employment decisions upon which their systems for performance of these functions must rest . . . ." National League of Cities v. Usery,supra, 426 U.S. at 851, 96 S.Ct. at 2474.
 
 
 27
 Nor does the City lack standing because of the failure of its creator, the State, to join in its claims. It is true that the State has not only failed to join the City in asserting the latter's defenses to enforcement of the Plan but, to the contrary, has defended the Plan and concedes that it is enforceable against it. However, we are not faced with a situation in which enforcement is sought solely against the State, or with a challenge by the City directed against a State-implemented statute, in either of which events the City might lack standing, see e.g., New York v. Richardson, 473 F.2d 923 (2d Cir.), cert. denied, 412 U.S. 950, 93 S.Ct. 3012, 37 L.Ed.2d 1002 (1973). Instead this enforcement proceeding is directed against the City and its officials. To the extent that the State has delegated certain sovereign powers to the City and left it up to the City to comply with the Plan, the State's failure to join in the City's claim does not eliminate the City's claim that it will be directly injured in the performance of governmental functions by the allegedly impermissible exercise of federal power. The City therefore has standing.
 
 
 28
 Appellants next contend that the district court should have denied the City's motion to vacate the partial summary judgment previously entered against it on the ground that the City was precluded from making the motion by § 307(b) (2) of the Act, which bars any defense in an enforcement proceeding for "which review could have been obtained" in a petition for review of the Administrator's approval of a plan. Appellants contend that the arguments that enforcement of the Plan would violate the City's Tenth Amendment rights and that the Plan should be enforceable only against the State and City as direct polluters, could have been raised by a petition for review filed by the City within 30 days after the Administrator's approval of the Plan and cannot therefore be asserted at this late date.
 
 
 29
 The purpose of § 307 was to assure that once an implementation plan had been promulgated by a state and approved by the EPA and a reasonable time had been allowed for affected parties to seek by way of a petition for review to have it modified or nullified, it would have finality and become enforceable. If states and their subdivisions, after preparing and through their responsible executives accepting the obligation of enforcing implementation plans under the Act, were allowed to disregard their commitments and to renege upon the obligations undertaken by them, the plans would amount to nothing more than voluntary, unenforceable declarations of principles. Congress was authorized by the Commerce Clause, and clearly intended, to accomplish more. As Senator Muskie, the floor manager of the Senate version of the Act stated, "Federal enforcement under section 113 leaves the primary responsibility with the States for enforcing requirements under implementation plans," 116 Cong.Rec. 42385 (1970).
 
 
 30
 In order to protect public health effectively Congress provided that such plans, after fair allowance for due process, would be enforceable. For these reasons § 307 has been upheld as a bastion of enforceability. See Union Electric Co. v. EPA, 427 U.S. 246, 96 S.Ct. 2518, 49 L.Ed.2d 474 (1960); Oljato Chapter of Navajo Tribe v. Train, 169 U.S.App.D.C. 195, 515 F.2d 654 (1975); Getty Oil Co. v. Ruckelshaus, 467 F.2d 349 (3d Cir. 1972), cert. denied, 409 U.S. 1125, 93 S.Ct. 937, 35 L.Ed.2d 256 (1973).
 
 
 31
 Were we now confronted with a claim that the State and City had until recently been unaware of the scope, terms and reach of the Plan or of the scheme for its enforcement, and hence were not in a position sooner to question its constitutionality or interpretation, the defenses now belatedly invoked by the City might conceivably be entertained. In contrast, the picture before us is one where the City, having voluntarily cooperated with the State in the drafting and promulgation of the very strategies now attacked by it, seeks in effect to renege on its own creation and commitment.
 
 
 32
 The architects of the Plan were not Congress or the EPA but the State and City of New York. Rather than permit the EPA to draft and implement a plan, which would have occurred if the State had defaulted in doing so, the State and City long ago chose to exclude the EPA from the policy-making process and to draft the Plan themselves subject only to EPA review and approval. In clear and unmistakable terms the Plan obligates them to carry out the very strategies which the City now contends that it cannot be ordered to enforce. Indeed, the Plan repeatedly refers to and lists the different State and City departments and agencies that are to implement these strategies, including the borough governments, the Interstate Sanitation Commission, Port of New York Authority, Triborough Bridge and Tunnel Authority, New York State Thruway Authority, New York City Fire and Police Departments, New York City Hospital and Ambulance Operators, and Metropolitan Transportation Authority. Moreover, the record shows that the City's EPA Administrator was advised in September 1973 by one of the City's counsel that the Plan was enforceable against it.
 
 
 33
 There is no suggestion that upon the State's submission of the Plan to the Administrator of the EPA in 1973 for approval the City, if it had wished to avoid the obligations which it had voluntarily assumed as a subdivision of the State, could not have advised the Administrator that it had changed its mind and did not propose to be responsible for carrying out the strategies which, according to the Plan, were to be implemented by it. Indeed, even after the approval of the Plan by the Administrator, the City could within 30 days have filed a petition for review, advancing its present contentions to the effect that the Plan, insofar as it provided for implementation of certain strategies by the City or its agencies, be revised or modified to relieve it of any obligation to enforce the Plan's strategies against others.
 
 
 34
 Had the City taken such action, the Administrator might well have disapproved the Plan on the ground that its provisions for implementation and enforcement were illusory and therefore did not meet the criteria specified in § 110(a)(2) of the Act, 42 U.S.C. § 1857c-5(a)(2). If the Administrator had nevertheless approved the Plan, the court upon a petition for review, would have been obligated to consider whether the Plan was, for the constitutional reasons now advanced by the City, unenforceable as written and decide whether the Administrator was required to approve it under § 110(a)(2). See Train v. Natural Resources Defense Council, 421 U.S. 60, 79, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975); South Terminal Corp. v. EPA, 504 F.2d 646, 676-80 (1st Cir. 1974). Had the Administrator disapproved the Plan or the court set aside his approval of it, the Administrator would then have had the opportunity to take appropriate action, including the promulgation of an EPA-formulated plan in lieu of the Plan here under consideration, which the EPA could then have enforced. At this date, almost four years after the Administrator's approval of the Plan, to permit the City to renege upon its commitments would defeat the purpose of the Act, which is to protect the public health.
 
 
 35
 Since the City could have advanced its present contentions by way of a petition for review of the Administrator's approval of the Plan in 1973 and chose instead voluntarily to commit itself to enforcement of the Plan, we hold that the City has waived its right to assert these contentions and is precluded by § 307(b)(2) of the Act from raising them in an enforcement proceeding instituted under § 304. See Vargas v. Trainor, 508 F.2d 485 (7th Cir. 1974), cert. denied, 420 U.S. 1008, 95 S.Ct. 1454, 43 L.Ed.2d 767 (1975) (waiver by state welfare official of state's Eleventh Amendment rights). Our modification of our mandate to permit the City to raise constitutional issues was not designed to permit the City to attack the Plan on grounds which amount to an about-face of its own endorsement of the Plan and which could have been raised by it years ago.
 
 
 36
 Nor can the City at this late date escape the obligations voluntarily undertaken by it on the ground that the Plan failed to furnish adequate assurances that the State would have the necessary personnel and funding to carry out implementation. The State has not been heard to assert this or any other argument as a basis for invalidating the Plan. Nor has the State sought to avoid responsibility for its enforcement. On the contrary, it has acknowledged the enforceability of the Plan. See Friends II, supra, at 170, 179-80. We would not be justified, therefore, in assuming that the necessary legislative and budgetary steps will not be undertaken to carry out the Plan. Should the State conclude that the Plan should be revised, it may submit such revisions as are necessary to the Administrator for approval under § 110(a)(3) of the Act.
 
 
 37
 Even if we were to assume that the City had not waived the claims asserted by it upon remand and was not precluded by § 307 from asserting them, we would be forced to conclude that the district court erred in holding that the State and its political subdivision, the City, were not obligated to enforce the Plan. The language of the Plan itself makes it clear beyond any reasonable doubt that both the State and City represented that their responsible officials would carry out each of the detailed strategies outlined in the Plan, using the State and City personnel and facilities described in the Plan. Indeed the Plan, which was prepared by the New York State Department of Environmental Conservation with participation by New York City's Environmental Protection Administration, was submitted by the Governor of the State of New York to the EPA Administrator for approval.
 
 
 38
 In effect, the district court held that after a state, with the participation and cooperation of its political subdivision, drafts and submits to the EPA for approval an implementation plan (1) which complies with the criteria of § 110 of the Act, (2) which is approved by the Administrator as required by the Act, see Union Electric Co. v. EPA, supra, (3) which has the effect of foreclosing formulation and imposition of a substitute federal plan, see Natural Resources Defense Council v. Train, supra, and (4) which is acknowledged by the state to be enforceable, the subdivision may nevertheless renege on enforcement of the Plan on the ground that it would prefer to use its scarce resources for other purposes despite a statutory scheme which contemplates mandatory enforcement. See Natural Resources Defense Council v. Train, supra. This decision is directly contrary to our holding that "acceptance by the EPA and judicial ratification by this court" resulted in the Plan becoming "binding upon and enforceable against state and local officials, subject only to the narrow revision and postponement provisions allowed by the Act." We held that "Once a citizen suit to enforce an EPA-approved state implementation plan has been properly commenced, the district court is obligated . . . to issue appropriate orders for its enforcement."
 
 
 39
 The authorities relied upon by the district court as the basis for departure from our mandate, Brown v. EPA, supra, and District of Columbia v. Train, supra, are clearly inapplicable to this case. In each of those cases, as well as in State of Maryland v. EPA, supra, and in State of Arizona v. EPA, supra, the EPA, a federal agency, sought to compel states or their political subdivisions to take steps (including appropriation of funds, adoption of legislation and use of state agencies and police) to implement and enforce a plan formulated by the EPA without any participation on the part of the state or any authorization of or consent to implementation or enforcement by the state. The basic question raised by these decisions, as to which we intimate no view, was whether the federal government might, without violating the state's Tenth Amendment rights, impose upon a state government a series of federal policy decisions concerning control of transportation-related pollution, and through imposition of sanctions require the state to enact and enforce appropriate measures essential to carry out the federal plan. The courts in those cases interpreted the Act as not permitting such intrusion by the federal government into state sovereignty except to the extent that the pollution might be caused solely by a source or activity controlled by the state (e. g., state-owned vehicles or incinerators) since the states otherwise might be deprived of control over the extent and manner in which their tax revenues could be spent and thus be turned into instruments for implementation of federally-dictated policies at variance with their own. All of this, it was indicated, might violate the states' Tenth Amendment rights or their right to a republican form of government. See Const. Art. IV, § 4.
 
 
 40
 Although the district court here attempted to place the present case within the mold of Brown, District of Columbia and Train, the facts and the issues here are significantly different and clearly distinguishable. The most fundamental difference lies in the fact that, in contrast to those cases, the State here has clearly and unequivocally promulgated its own pollution-control plan which represents its own policy decision, formulated through public notice by the State to its citizens and local governments, and through State-conducted public hearings.
 
 
 41
 The Plan was enacted in compliance with a statutory scheme which the State knew would result in federal approval so long as the State plan met the eight specified criteria, as well as in foreclosing promulgation of a federal plan that would have been enforceable against polluters by the EPA or by citizens. The State thus entered into a pact based on cooperative federalism under which it made the essential policy choices and determined the procedures that should be adopted by it and its subdivisions to comply with federal pollution standards which Congress undisputably had the power to enact under the Commerce Clause to protect the public health, since pollution is interstate in character and effect. Under this pact the State, as well as its subdivisions, became obligated to implement the Plan. In return, it received the assurance that the federal government would not substitute or administer its own plan. We find that this scheme does not impermissibly interfere with the governmental functions of the State or of its subordinate arm, the City.
 
 
 42
 The parties do not, and indeed cannot, dispute the fact that the Clean Air Amendments of 1970 regulate an area well within the federal government's plenary commerce power. Fry v. United States, 421 U.S. 542, 547, 95 S.Ct. 1792, 44 L.Ed.2d 363 (1975); Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964). The question, therefore, is whether this admittedly valid exercise of the commerce power nonetheless impermissibly interferes with the integral governmental functions of a state and its local governments. In National League of Cities the Supreme Court held that the principles embodied in the Tenth Amendment limit federal power to the extent that
 
 
 43
 "there are attributes of sovereignty attaching to every state government which may not be impaired by Congress, not because Congress may lack an affirmative grant of legislative authority to reach the matter, but because the Constitution prohibits it from exercising the authority in that manner,. . . ." 426 U.S. at 845, 96 S.Ct. at 2471.
 
 
 44
 Applying this basic principle, the Court held that the 1974 Amendments to the Fair Labor Standards Act, 29 U.S.C. §§ 201, et seq., which extended the coverage of its minimum wage and maximum hour provisions to almost all public employees of the states and local governments, transgressed the Tenth Amendment because the effects of the amendments would be to increase state and local budgetary requirements very substantially, to curtail state and local policy initiatives, and to cause significant cutbacks in state and local training programs, as well as in local affirmative action employment and internship programs. The net result would be to interfere with the integral functions of these governments by altering or displacing their ability to structure employer-employee relationships in such areas as fire prevention, police protection, sanitation, public health, and parks and recreation. Said the Court, "If Congress may withdraw from the States the authority to make those fundamental employment decisions . . . we think there would be little left of the States' 'separate and independent existence,' " 426 U.S. at 851, 96 S.Ct. at 2474.
 
 
 45
 In determining whether an otherwise valid exercise of the federal commerce power would impermissibly impair state sovereignty we are therefore required to balance the reason for the exercise against the extent of usurpation of state policy-making or invasion of integral state functions that would result, giving "appropriate recognition to the legitimate concerns of each government." Pacific Coast Dairy v. Department of Agriculture, 318 U.S. 285, 304, 63 S.Ct. 628, 635, 87 L.Ed. 761 (1942) (Murphy, J., dissenting). The present case presents neither an interference with integral governmental functions of the City, nor a usurpation of State or City decision-making. On the contrary, the Plan reflects State and City policy decisions to be carried out by them according to their own dictates rather than those of the federal government. In formulating, proposing, and revising the Plan through public notice and public hearings, the State exercised its sovereign powers to make policy choices participated in by its citizens and its political subdivisions. Indeed, the State's freedom to choose and formulate its own policy concerning crucial local issues was preserved by and written directly into the Clean Air Act Amendments of 1970. As Justice Rhenquist noted in Train v. Natural Resources Defense Council, supra, 421 U.S. at 60, 95 S.Ct. at 1481:
 
 
 46
 "Under § 110(a)(2), the Agency is required to approve a state plan which provides for the timely attainment and subsequent maintenance of ambient standards, which also satisfies that section's general requirements. The Act gives the Agency no authority to question the wisdom of a State's choices of emission limitations if they are part of a plan which satisfies the standards of § 110(a)(2). . . ." (Some emphasis supplied).
 
 
 47
 To the extent that the City claims that enforcement of the State-promulgated policies would displace City policy in allocating its resources, the State policy must prevail, since the City is but a creation and subdivision of the State and in this case participated in the State policy-making decisions.
 
 
 48
 The City's claim of federal interference with its police power, legislative and budgetary policies, and with other services wholly within its control, is neither substantial nor directed toward an integral governmental function. The City does not allege, for instance, that enforcement of the Plan will entail basic structural changes in police services or in any other traditional local service. The impact of enforcement, to the contrary, can be expected merely to involve the use of existing structures and personnel to make changes in various traffic programs, licensing procedures, and parking, delivery and taxi regulations. The necessity of appropriating funds for the construction of toll facilities (from which it will receive revenue) or for the acquisition of private garages under the business-district parking reduction plan does not amount to the kind of injury found to be impermissible in National League of Cities, since the essential policy choices involved in creating the program were entirely within the control of the State and the participating City agencies, and not imposed by the federal government.
 
 
 49
 Moreover, the prospect that the City may be required to take action in the area of transportation control cannot be considered an interference with an "integral" governmental program or service. The regulation of traffic on roads and highways, with its strong regional and interstate character (particularly in the New York City metropolitan area), has long been considered to be a cooperative effort between City, State and federal authorities, with no single entity being able to provide or impose a comprehensive traffic system, and with federal power, where necessary, taking precedence. See City of Burbank v. Lockheed Air Terminal, Inc., 411 U.S. 624, 638-39, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1972). Quite significantly, in National League of Cities v. Usery, supra, 426 U.S. at 854 n.18, 96 S.Ct. 2465, the Court reaffirmed the validity of United States v. California, 297 U.S. 175, 56 S.Ct. 421, 80 L.Ed. 567 (1936), on the grounds that a state could be required to operate its railroad lines in conformity with federal regulations despite a claim of interference with state government. The Supreme Court distinguished United States v. California from National League of Cities on the ground that the operation of a railroad was not "an area that the States have regarded as integral parts of their governmental activities." The same can be said of the operation of streets and bridges so far as their impact on the national problem of air pollution is concerned.
 
 
 50
 The enforcement mechanism at issue in this case is, we believe, closer to the Economic Stabilization Act of 1970, upheld in Fry, et al. v. United States, 421 U.S. 542, 95 S.Ct. 1792, 44 L.Ed.2d 363 (1975), and distinguished by the Court in National League of Cities, which authorized the President to freeze the wages of state employees during a severe threat to the national economy. Reasoning that "effectiveness of federal action would have been drastically impaired" if state employees were excluded from the Act, the Supreme Court upheld the statute. In National League of Cities, the Court found Fry "quite consistent" with its holding because in Fry (as here) there was (1) a "serious problem which endangered the well-being of all the component parts of our federal system and which only collective action by the National Government might forestall," (2) a carefully drafted program designed for very limited interference with states' freedom, and (3) a program that "displaced no state choices as to how overnmental operations should be structured." 426 U.S. at 853, 96 S.Ct. at 2474.
 
 
 51
 The facts here are analogous. The Clean Air Act Amendments of 1970 are directed toward a significant national health and safety problem air pollution which respects no political boundaries. Residents in the vicinity of New York City, including some persons in New Jersey and Connecticut, are critically in need of a reduction in carbon monoxide pollution which was, at the time of this suit, five times the national health standard. The entire structure of the Clean Air Amendments was aimed at providing the states with primary responsibility for establishing policy and implementation procedures to meet the national goals in order to minimize federal intrusion. Federal imposition of policy upon the State never took place in this case, and would only have taken place under the Act if the State had refused to submit its own Plan. In the context of the enforcement of the Plan through citizen suit, the choices and procedures are the products of State choice, not of federal policy, and may legitimately be enforced by the district court.[7]
 
 
 52
 For these reasons, we grant appellants' motion to vacate the decision of the district court dated July 13, 1976, and for a writ of mandamus, and remand the case to the district court with directions to reinstate its partial summary judgment entered on April 30, 1976, to the end that the pollution control strategies which were the subject of that judgment will be promptly implemented.
 
 
 
 [1]
 These strategies are: reductions in business district parking, selective ban on taxicab cruising, tolls on the East and Harlem River bridges, and night-time freight movement programs. At the time of this suit the State had consented to the imposition of eight other strategies, including emissions inspections, mechanic training, enforcing existing traffic regulations, traffic management, increased express bus services, and retrofit of trucks
 
 
 [2]
 Judge Duffy certified the decision for interlocutory review pursuant to 28 U.S.C. § 1292(b). On August 18, 1976, a Court of Appeals panel denied appellants leave to appeal
 
 
 [3]
 The Plan refers at the outset to the "cooperation and extensive effort" of the New York City agencies in its preparation, stating:
 "Preparation of this plan has required cooperation and extensive effort by many individuals and agencies. In particular, staff of the Department of Air Resources of the New York City Environmental Protection Administration made a major contribution through expert dedicated effort. Other city, state, and regional agencies provided valuable assistance."
 In his letter dated April 17, 1973, submitting the Plan to Hon. William D. Ruckelshaus, Administrator of the EPA for approval, Governor Nelson A. Rockefeller stated that "The City of New York has worked with us in developing this plan" and quoted a letter received from Mayor John V. Lindsay, dated April 16, 1973, which, while expressing reservations as to the City's capability of financing the costs of implementing the Plan, stated that "New York City is committed to meeting Federal air standards under the Clean Air Act of 1970," that "We have cooperated in the development of the New York City Metropolitan Air Quality Implementation Plan proposed by the State and are convinced that the Plan accurately reflects the scale of effort and types of measures which must be undertaken to meet the 1975 air standards." Mayor Lindsay further stated, "We must make a sincere effort over the coming months to examine the public costs and explore appropriate new revenue sources. Upon Federal approval of the plan and a commitment of adequate fiscal resources, the City will support and will move to implement the measures necessary to meet the Federal requirements for cleaner air."
 Governor Rockefeller's letter of submission further advised the Administrator of EPA that "To carry out the Federal mandate set forth in the Clean Air Act of 1970, the State and the City have no alternative but to implement the following primary 'strategies' (actions under the overall plan) as rapidly as possible". There follow a list of strategies which include those which were the subject of the order here at issue. The Governor further advised that he was submitting to the New York State Legislature bills to implement some of the strategies, that
 "The State and City of New York are ready to commit to major innovations to reduce the pollution from transportation sources in the metropolitan area. Both the City and the State, however, will require new funding to support this program both money to administer the program and assistance in making capital investments necessary to bring about required improvements in mass transit.
 "Congress has mandated; Congress should also provide necessary funds. An important facet of this action by Congress should be to allow urban states to use their share of highway trust funds for mass transit."
 
 
 [4]
 We considered the principal New York implementation plan in Natural Resources Defense Council v. EPA, 494 F.2d 519 (2d Cir. 1974). However, that plan did not include the transportation plan at issue in the present case because the Administrator had granted an extension of the date for the submission of the plans, and the date of compliance with applicable standards was extended to May 31, 1977. Subsequently, the District of Columbia Circuit in Natural Resources Defense Council v. EPA, 475 F.2d 968 (1973), invalidated that extension and the date for submission of the State of New York plan was set at April 15, 1973, with the date of compliance with air quality standards set at May 31, 1973. See Friends of the Earth v. EPA, 499 F.2d 1118, 1121 (2d Cir. 1974)
 
 
 [5]
 Two factually and legally similar cases are Maryland v. EPA, 530 F.2d 215 (4th Cir. 1973), cert. granted, 426 U.S. 904, 96 S.Ct. 2224, 48 L.Ed.2d 829 (1976), and State of Arizona v. EPA, 521 F.2d 825 (9th Cir. 1975), cert. granted, 426 U.S. 904, 96 S.Ct. 2224, 48 L.Ed.2d 829 (1976)
 
 
 [6]
 The district court analyzed each of the four strategies under consideration in the case to determine the extent to which it imposed duties upon the State as a direct or indirect polluter, rather than requiring the State to enforce strategies against citizen polluters. With respect to the Central Business District Parking strategy, the court found unenforceable the State's incentive program for private garage owners to abandon their facilities, the State's plan to purchase private garages, and certain planning and data collection programs to be undertaken by the City and State. The court found that reduction of on-street parking and a freeze on new permits for off-street garages would be permissible
 With respect to the Taxi-Cruising Limitation strategy, the court found that data collection, public education programs and plan formulation were outside the scope of a proper order, but that a plan to restrict taxi licensing might be enforceable. The After-Hours Delivery strategy, designed to limit deliveries during heavy-traffic hours, was held enforceable only to the extent that the defendants themselves were deliverers or receivers of goods. Finally, with respect to the imposition of tolls on the East and Harlem River bridges, designed to discourage automobile traffic from entering Manhattan, the district court found that the State could not be required to construct toll facilities, and it accepted the position of the Federal Highway Administrator that at least four of the bridges, constructed with federal funds, could not be tolled by the State. However, in a later opinion letter dated June 28, 1976, which was submitted to the district court by the United States Attorney's Office, this time the General Counsel of the Department of Transportation, the Federal Housing Administrator's superior, advised that there is no federal bar to tolling the four bridges as part of a traffic control program pursuant to the Clean Air Act.
 
 
 [7]
 Our decision that the Plan is enforceable is not to be construed as relieving the EPA Administrator of his duty to provide, pursuant to our order in Friends I, supra, 499 F.2d at 1126, a statement of the available State, City and federal resources for implementation of the Plan. However, while the State and City have, in submitting the Plan to the EPA Administrator for approval in 1973, expressed reservations about their capability of financing the costs of implementation and we are well aware of the current fiscal crisis in which the City finds itself, neither has stated that it must for financial reasons renege on the commitments made by it when the Plan was submitted to the EPA for approval in 1973. Nor have we been advised that the New York Legislature has refused to appropriate the funds needed to implement the Plan. The State's appropriation of adequate resources for the implementation of the Plan is therefore not an issue before us. On the contrary, as the record stands the responsible chief executives of the State and City have indicated that while financing of the Plan would pose problems in policy choices concerning the allocation of resources, they would take the necessary steps to obtain the financial support required