William H. **CONWAY**, Jr. and Gordon B. MacArthur, Plaintiffs,

v.

Brian **SEARLES**, State of Vermont Commissioner of Personnel, and State of Vermont, Defendants.

No. 5:94–CV–309.

United States District Court, D. Vermont.

Jan. 29, 1997.

John Scott Cameron, Paterson & Walke, P.C., Montpelier, VT, for plaintiffs William H. Conway, Jr., Gordon B. MacArthur.

Jeffrey L. Amestoy, Attorney General, William Eugene Griffin, John Wallace Malley, Jr., Vermont Attorney General's Office, Montpelier, VT, for defendants.

*FINDINGS OF FACT, CONCLUSIONS OF LAW, OPINION AND ORDER*

SESSIONS, District Judge.

This is a 42 U.S.C. § 1983 action filed by Plaintiffs William H. Conway, Jr. ("Conway") and Gordon B. MacArthur ("MacArthur") against Brian Searles, Commissioner of Personnel of the State of Vermont, and the State of Vermont. Plaintiffs claim that their procedural due process, substantive due process, and equal protection rights under the Fourteenth Amendment of the United States Constitution and under the Vermont Constitution were violated when the Vermont Legislature enacted Section 238a of No. 210 of the Acts of 1994 ("Section 238a"), transferring the positions Plaintiffs held in the Agency of Transportation ("AOT") from classified to exempt status. Plaintiffs seek a declaratory judgment, declaring the relevant legislation unconstitutional, as well as compensatory damages. Defendants oppose Plaintiffs' petition. The case was tried to Court commencing October 8, 1996. At the close of Plaintiffs' case, Defendants moved for Judgment on Partial Findings, pursuant to Fed.R.Civ.P. 52(c). For the reasons discussed below, Defendants' Motion for Judgment on Partial Findings is GRANTED.

### I. Findings of Fact

This action arises under 42 U.S.C. § 1983. The Court has jurisdiction of the action under 28 U.S.C. §§ 1331 and 1343.

### A. Plaintiffs

Plaintiffs are division directors within the Vermont Agency of Transportation. Each has an impressive record in government service, and in AOT in particular. Plaintiff William Conway holds a Bachelor of Science degree in management from the University of New Hampshire, and a Master's degree from Wagner College in New York City. He has been continuously employed by the State of Vermont since May 28, 1973. He began his career in state government as a Budget and Management Analyst, a classified position. From September 16, 1975 to January 10, 1977, he served in the exempt service as

Deputy Commissioner of Motor Vehicles. He subsequently served as Acting Commissioner of Motor Vehicles and as Commissioner of Motor Vehicles, both exempt positions. After nearly ten years as Commissioner, Conway returned to classified service as Transportation Administration and Support Services Director. He held this position concurrent with the position of Commissioner of Motor Vehicles from November 23, 1987 to October 6, 1989, at which time he relinquished his position as Commissioner and continued to serve solely as a director. He continues to serve in this capacity today.

Plaintiff Gordon MacArthur holds a Bachelor of Science degree in civil engineering from the University of New Brunswick and a Master's degree in civil engineering/transportation engineering from the University of Vermont. He is certified as a professional civil engineer in the state of Vermont. Like Conway, MacArthur has a long record of service in state government. He has worked continuously for AOT since 1968. From June 1968 to March 1973, MacArthur held a variety of non-management positions in the classified service in general civil engineering, materials testing, traffic data analysis, and project inspection. MacArthur went on to hold a number of classified supervisory and managerial positions within AOT. In June 1989, MacArthur became Director of Engineering, a position today known as Planning and Preconstruction Director for Engineering. At the time, this was a classified position. He held this position in 1994 when his position and three others were converted from classified to exempt service. He currently holds the position of Director of Construction and Maintenance, which is also one of the four converted positions.

In their decades of state government service, neither Conway nor MacArthur has ever received a negative performance evaluation. On the contrary, each has consistently been promoted to higher positions of responsibility and authority.

*B. Overview of State Government*

Understanding the nature of Plaintiffs' positions and the circumstances that give rise to this case demands an explication of the structure of Vermont state government. The state government is comprised of five umbrella agencies: Administration, Commerce and Community Development, Human Services, Natural Resources, and Transportation. Each agency was created by statute and is headed by a secretary who is appointed by, serves at the pleasure of, and reports directly to the governor. Within each agency are separate departments, defined as major components of the agency, the creation of which are authorized, and in most instances mandated, by statute. Vt.Stat.Ann. tit. 3 §§ 2201, 2202 (1995 and Supp.1996) (Administration); §§ 2401, 2402 (Commerce and Community Development); §§ 2801, 2802 (Natural Resources); §§ 3001, 3002 (Human Resources); Vt.Stat.Ann. tit. 19 §§ 1, 2 (1987 and Supp.1996) (Transportation). The secretary of each agency appoints, with the approval of the governor, commissioners to act as the chief executive and administrative officer of each department. Commissioners serve at the pleasure of the secretary. Within many of the departments are divisions, defined as major components of a department or agency. Vt.Stat.Ann. tit. 3 §§ 2201, 2401, 2801, 3001 (1995); Vt.Stat.Ann. tit. 19 § 1 (1987). However, divisions also exist independent of departments. Each division, whether within a department or not, is administered by a director. Directors of divisions within a department are appointed by the commissioner of that department, while all others are appointed by the secretary of the agency.

In each agency of state government, two types of job status exist: classified and exempt. The employment rights of most Vermont employees are governed by the State's classified personnel system. *See* Vt.Stat. Ann. tit. 3 Ch. 13 (1995 and Supp.1996). The classified employment system is founded upon "merit principles" that are intended to recruit, select, and advance employees on the basis of their relative abilities. *Id.* at §§ 310(f), 312(b). The system provides job tenure for classified employees "contingent on successful performance." *Id.* at 312(a). According to the rules adopted to implement the system, job tenure means that "[a]n employee will not be subject to dismissal or

suspension except for cause stated in writing to the employee." Vermont Rules and Regulations for Personnel Administration, Ch. 3.03 ("Personnel Regulations"). By their own terms, the Personnel Regulations continue only until the Legislature amends, modifies, or repeals either the personnel law or the regulations. *Id.* at Ch. 1.02.[1] Collective bargaining agreements between the State of Vermont and its unionized employees are permitted for a maximum term of two years. Vt.Stat.Ann. tit. 3 § 982(a) (1995).

The Department of Personnel determines the rank and pay of each classified position in state government. It is required by statute to base its determinations upon a point factor comparison method of job evaluation. *See* Vt.Stat.Ann. tit. 3 § 310(a) (1995). Under the method currently employed by the Department of Personnel, called the Willis system, the Department assigns levels to each classified position in state government in each of the following categories: job knowledge; managerial skills; independent judgment; problem solving; freedom to take action; size of impact of the position on the agency budget; nature of the impact; physical efforts required; hazards incident to the job; and discomfort involved. The levels assigned to each of these factors determine the pay grade for that position. *See* Defendants' Exh. F. Pay grades range from 5 to

32, 32 being the highest pay grade available in the classified system.

Generally, the highest-ranking employees in each agency are exempt from the classified system. Exempt employees serve at the pleasure of the state official who appointed them, and may therefore be fired without cause. The secretary of each agency is exempt, and serves at the pleasure of the governor. *See* Vt.Stat.Ann. tit. 3 § 2204 (1995) (Administration); § 2404 (Commerce and Community Development); § 2804 (Natural Resources); § 3004 (Human Services); and Vt.Stat.Ann. tit. 19 § 9(a) (Supp.1996) (Transportation). Commissioners of agency departments are also exempt, and they serve at the pleasure of the secretary of the agency to which their department belongs. *Id.; see also* Vt.Stat.Ann. tit. 3 §§ 2251, 2451, 2851 and 3051 (1995); Vt.Stat.Ann. tit. 19 § 8(a) (1987). In addition, deputy secretaries, deputy commissioners, attorneys, and members of boards, committees, commissions or councils that are attached to the agency are exempt. *See* Vt.Stat.Ann. tit. 3 §§ 2204, 2404, 2804, and 3004 (1995); Vt.Stat.Ann. tit. 19 § 7(h) (Supp.1996). In general, division director positions, such as those held by Plaintiffs, are classified.[2]

Whether a given position in state government is classified or exempt is a policy determination made by the Legislature for which there are no specific criteria mandated by

---

**1.** In addition to protections afforded by the classified personnel system, most State employees are union members who enjoy the rights secured by a collective bargaining agreement. *See* Vt. Stat.Ann. tit. 3 Ch. 27 (1995 and Supp.1996). Managers within the classified system are not union members and therefore are not directly covered by the collective bargaining agreement. *Id.* at §§ 311(a), 902(5)(F). Nevertheless, these managers retain the same right that bargaining unit employees have to appeal employment issues to the Vermont Labor Relations Board. *Id.* at § 1001(b); Personnel Regulations at Ch. 3.03. Additionally, they often receive benefits similar to those received by the unionized employees because the Department of Personnel regularly extends the benefits of the collective bargaining agreement to employees who are not members of a bargaining unit. *See* Vt.Stat.Ann. tit. 3 § 2222(f) (1995). In this case, the Department of Personnel's "Extension of Benefits" memorandum of August 5, 1992 granted to Plaintiffs and other non-union employees benefits that the union had gained in such areas as compensation,

holidays and tuition reimbursement. *See* Plaintiffs' Exh. 2 at 2. Like those in the underlying collective bargaining contract upon which the "Extension of Benefits" memorandum was based, the benefits extended in the August 5, 1992 memorandum were valid for two years, through June 30, 1994.

**2.** Vt.Stat.Ann. tit. § 2204 (1995) provides: "The secretary, deputy secretary, commissioners, deputy commissioners, attorneys and all members of boards, committees, councils, and commissions attached to the [Agency of Administration] for support are exempt from the classified state service. [Except as otherwise authorized], *all other positions shall be within the classified service."* (emphasis added). Vt.Stat.Ann. tit. 3 §§ 2404, 2804, and 3004 (1995) provide identical language for the Agencies of Commerce and Community Development, Natural Resources, and Human Resources, respectively. Prior to the passage of Section 238a, Vt.Stat.Ann. tit. 19 § 9 provided identical language as well.

law. As a general rule, those in state government who make policy are exempt employees, and those who implement such policy are classified. This distinction has been espoused by the Governor, *see* Plaintiffs' Exh. 13, and is generally accepted by legislators. However, there is not a bright line between classified and exempt positions.

## C. Organizational Structure of AOT

Despite the general organizational framework outlined above, the structure of AOT is somewhat different. AOT is one of the largest agencies in Vermont state government, consisting of over a thousand employees. It has a correspondingly large operating budget of approximately $180 million. *See* Defendants' Exh. G at 5. Whereas the Agency of Administration consists of four departments, Commerce and Community Development consists of three, Natural Resources consists of three, and Human Resources consists of six, there is only one department in AOT: the Department of Motor Vehicles ("DMV"). DMV is a free-standing, policy-setting branch of AOT in which the commissioner has independent authority on a number of decisions, such as setting the lengths of license suspensions for violation of motor vehicle laws, or the application filing fees at the Department. *See generally* Vt.Stat.Ann. tit. 19 § 8 (1987); Vt.Stat.Ann. tit. 23 § 1 (1987). In addition to DMV, there are five divisions in AOT, each of which stands independent of DMV: Transportation Planning, Transportation Planning and Preconstruction, Transportation Construction and Maintenance, Administration and Support Services, and Rail, Air and Public Transportation. None of these divisions are mandated by statute. Rather, they have been created by a general authority vested by statute in the Secretary of Transportation.[3] Division directors report directly to the Secretary of Transportation, just as does the Commissioner of DMV.

In most instances in state government, division directors serve under and report to department commissioners. *See, e.g.,* Vt.

Stat.Ann. tit. 3 §§ 2454, 2854, and 3054 (1995). Because AOT's five divisions stand independent of any department, however, its division directors do not report to a commissioner. Rather, four of the division directors report directly to the Secretary of Transportation, while the fifth reports to the deputy secretary, who in turn reports to the secretary. The four division directors who report directly to the secretary are those whose positions were converted from classified to exempt by Section 238a: the Directors of Transportation Planning, Transportation Planning and Preconstruction, Transportation Construction and Maintenance, and Administration and Support Services. The Director of Rail, Air and Public Transportation—the only division director position not rendered exempt by Section 238a—reports to the deputy secretary.

As directors of the Transportation Administration and Support Services division and the Engineering division, respectively, Plaintiffs Conway and MacArthur were classified employees prior to July 1, 1994. The Department of Personnel had determined Conway's position to have a pay grade of 31, and MacArthur's to have a pay grade of 32. These pay grades reflected the wide discretion that each Plaintiff had in his position. In 1994, only one position in state government other than MacArthur's had a pay grade of 32. Only a small number of positions in all of state government have a pay grade over 30.

The divisions within AOT headed by Plaintiffs differ substantially from comparable divisions in other agencies with respect to the number of employees involved and the amount of money managed. The Director of Transportation Administration and Support Services, for example, supervises one hundred employees, as compared with the Director of the Human Services Administration division within the Agency of Human Services—the next largest administration division in state government—who supervises 30.

---

**3.** Vt.Stat.Ann. tit. 19 § 2 (Supp.1996) provides: "The [Agency of Transportation] shall be comprised of the following: (1) the department of motor vehicles; (2) such divisions as the secretary finds necessary to carry out the provisions of

Titles 5 [Aeronautics and Surface Transportation Generally] and 19 [Highways], as well as any other duties imposed by law on the agency or the secretary."

Defendants' Exh. GG. The Transportation Planning and Preconstruction Director supervises 200 employees, in comparison with the twenty-five employees who work under the director of State Buildings Engineering and Construction. *Id.* Similarly, the budgets managed by the AOT division directors—approximately $14 million in the case of MacArthur, and over $7 million in the case of Conway—are far greater than those managed by comparable division directors in other state agencies. *See* Defendants' Exhs. E and G.

AOT has had a history of managerial problems. Having recognized these problems, the Legislature created a Joint Transportation Oversight Committee ("JTOC") to provide legislative overview of AOT. This committee commissioned and supervised a comprehensive study of the agency, conducted by Canby Associates, in 1990 ("Canby Report"). The Canby Report confirmed the commonly held belief that AOT was in need of substantial managerial improvement, and made numerous recommendations to this end. *See* Defendants' Exh. K. In 1993, JTOC was made a permanent standing committee of the Legislature. *See* Vt.Stat.Ann. tit. 19 § 12b (Supp.1996).

## D. The Role of the Agency of Administration

The Agency of Administration plays a unique role in Vermont state government because it has oversight authority over the other state agencies. The Agency of Administration consists of five departments: Finance and Management; Personnel; General Services; State Buildings; and Taxes. Vt. Stat.Ann. tit. 3 § 2202(a) (1995 and Supp. 1996). Each department is headed by a commissioner who reports to the secretary. By virtue of the fact that the agency includes the Department of Finance and Management, the agency has substantial influence over the expenditure of state revenues by all state agencies, and not merely the Agency of Administration. This control over expenditures allows the secretary to play an inter-agency administrative role in order to mediate and manage issues that cut across the other four agencies of state government.

The Secretary of Administration is the "principal administrative aide to the governor," Vt.Stat.Ann. tit. 3 § 2222(a)(1) (1995), and is regarded as the "first among equals" in the governor's cabinet. *See* Testimony of Patrick Garahan. The secretary is statutorily authorized to issue, with the approval of the governor, general policy statements, rules, and regulations applicable to the entire executive branch to "implement executive orders or legislative mandate." Vt.Stat.Ann. tit. 3 § 2222(a)(2) (1995). The secretary is further authorized to advise the governor and Legislature on matters relating to general administration. *Id.* at § 2222(a)(3).

For all times relevant to the present case, William H. Sorrell was the Secretary of Administration.

## E. History of Section 238a

Secretary Sorrell was instrumental to the introduction of Section 238a in the Legislature. The idea of transferring Plaintiffs' positions from classified to exempt service, now embodied in Section 238a, was originally conceived by Secretary Sorrell in the spring of 1994. In early to mid-May, Secretary Sorrell spoke with several legislators regarding reclassification of the four AOT division director positions. At this time, the Legislature was drawing toward the end of its session. One of the last bills for consideration was H. 864, the omnibus appropriations bill for fiscal year 1995, involving hundreds of millions of dollars. H. 864, as passed by the House of Representatives, contained no provision regarding reclassification of the four AOT positions in question, nor did the Senate version of the bill address the matter. At the time that Secretary Sorrell spoke with legislators about the reclassification issue, H. 864 had been referred to a Committee of Conference to work out differences between the bills passed by each of the two houses of the Legislature.

Secretary Sorrell first raised the matter with Speaker of the House Michael Obuchowski, then chair of the House Appropriations Committee and a member of the House conferees on the Committee of Conference appointed regarding H. 864. Secretary Sorrell expressed to Speaker Obuchowski his

interest in having the four AOT positions reclassified because he felt that it would enhance the responsiveness of the agency and improve service delivery if these high-level management positions were held at the pleasure of the Secretary of Transportation. Secretary Sorrell stated that a further purpose of the reclassification would be to bring the four positions in line with the overall structure of state government. He noted that on an organizational chart of AOT, Defendants' Exh. GG, the four division director positions in question were on the same level as the Commissioner of DMV, an exempt position, and suggested that all positions on the same level of the chart should be treated the same. Speaker Obuchowski expressed interest in the proposal.

Secretary Sorrell subsequently spoke with several other legislators, including Senators John Carroll and Richard Mazza. He made the same representations to them regarding the purpose of the proposed reclassification of positions as he made to Speaker Obuchowski. Secretary Sorrell spoke with the other House and Senate conferees on the Committee of Conference sometime prior to June 9, 1994.

Eventually, Secretary Sorrell drafted language to effectuate reclassification of the four AOT positions, and provided it to the Committee of Conference. This language was inserted into H. 864 as Section 238a by the Committee of Conference on June 9 or June 10, 1994. *See* Plaintiffs' Exh. 7. Soon thereafter, Plaintiffs learned of the matter and on June 10, discussed it with several legislators. Also on June 10, Plaintiff Conway encountered Secretary Sorrell in the Capitol. He asked Secretary Sorrell if he knew who was responsible for Section 238a, and Secretary Sorrell said that he was. Conway then asked Secretary Sorrell if by pushing the provision he was trying to fire Conway and the other three incumbents of the positions to be reclassified. Secretary Sorrell did not respond verbally, but Conway understood Sorrell's nonverbal conduct to indicate an affirmative answer. This discussion was witnessed by Plaintiff MacArthur, who also understood Sorrell to have indicated a nonverbal affirmative answer to Conway's question.

That day, Senator William Doyle, chairman of the Government Operations Committee, convened an informal, unofficial meeting of several senators who sit on the Government Operations Committee to address Section 238a. Even if it had met in formal session, the Government Operations Committee was without jurisdiction to consider H. 864, which was fundamentally an appropriations bill. The informal meeting was therefore solely for the purpose of allowing the affected parties—the Plaintiffs—to express their concerns. Secretary Sorrell was also present at this meeting, and again represented the purpose of the reclassification to be to increase agency efficiency. At this meeting, Plaintiffs voiced their opposition to Section 238a. When it became clear that they would be unsuccessful in getting the language removed, Plaintiffs sought the introduction of language into H. 864 that would protect the rights of the incumbents of the four AOT positions until the incumbents vacated their positions. Secretary Sorrell opposed this "grandfathering" language as inconsistent with the purposes of the legislation, and ultimately it was not included in H. 864.

The report of a committee of conference is to be confined to the differences of opinion between the houses that gave rise to the appointment of the committee, and the report is objectionable in form if it exceeds this scope. *See* Mason's Legislative Manual § 771 (Defendants' Exh. P); Joint Rules of the Senate and the House of Representatives of Vermont, Rule 19 (Defendants' Exh. O) ("a Committee of Conference shall meet.... [I]ts members shall state to each other, verbally or in writing, the reasons of each house for its vote *on the subject matter of disagreement;* confer freely thereon, and make report of their doings to their respective houses as soon as may be") (emphasis added). Objection to form must be made at the time the report is introduced, and may not be made at any later time. *See* Mason's Legislative Manual § 771 (Defendants' Exh. P). Even though it was not an issue of dispute between the House and Senate, Section 238a was included in the Committee of Confer-

ence's final report and was sent to both houses for a vote. However, no objection was made in either house as to the form of the Conference Committee's report at the time it was introduced.

A committee of conference report requires a strict up-or-down vote by the Legislature, without opportunity for amendment. There was some debate about Section 238a in the full session of the Senate, but ultimately H. 864 was approved by both legislative chambers, without a grandfathering clause. The final vote came at approximately 3:21 a.m. on Sunday, June 12, 1994, the last day of the legislative session. The bill made the change in Plaintiffs' positions effective as of July 1, 1994.

Secretary Sorrell never discussed his idea to reclassify the four AOT positions with Patrick Garahan, Secretary of Transportation, prior to the passage of Section 238a, and testified that he believed Secretary Garahan would have opposed the measure had he had prior knowledge of it. Secretary Garahan was out of the country at the time that Section 238a was introduced and ultimately passed. In addition, hearings were never held on Section 238a in the standing Transportation, Government Operations, or Appropriations committees of either chamber, nor in the Joint Transportation Operations Committee.

There is no evidence from the testimony of legislators with whom Secretary Sorrell consulted regarding Section 238a that the Secretary ever indicated an intention to fire Plaintiffs, or that the purpose of Section 238a was in any way personally motivated. Rather, all of the evidence presented demonstrates that the only purpose Secretary Sorrell ever set forth for the provision was to render the four AOT positions consistent with others in state government and to make the positions and

AOT as a whole more responsive to the public.

### F. Subsequent Legislative History: S. 144

In the 1995 legislative session, the year after the passage of Section 238a, a bill referred to as S. 144 was introduced in the Senate to restore as classified service positions the four division director positions rendered exempt by Section 238a. *See* Defendants' Exh. X. The bill was first considered by the Senate Committee on Government Operations. The Committee held hearings on the bill, and heard testimony from the public and from the Administration. The Administration opposed the bill, but S. 144 passed out of the Committee on Government Operations by a vote of six to zero. *See* Plaintiffs' Exh. 20. It was subsequently referred to the Senate Appropriations Committee, *see* Plaintiffs' Exh. 21, which apparently never held hearings on the bill and never voted on it. S. 144 therefore died in the Appropriations Committee, and was never voted on by the full Senate.

### II. Conclusions of Law, Opinion and Order

Plaintiffs William Conway and Gordon MacArthur seek declaratory judgment and compensatory damages in this action brought against Defendant Brian Searles in his official capacity as State of Vermont Commissioner of Personnel, and against Defendant State of Vermont.[4] Plaintiffs allege that Section 238a of Act 210 of the Acts of 1994 unlawfully converted Plaintiffs' state government positions from classified to exempt, in violation of their Fourteenth Amendment due process and equal protection rights, as well as equivalent rights under the Vermont Constitution. Defendants oppose Plaintiffs' petition.

Secretary of Administration Sorrell would not be in the position to provide any remedy to Plaintiffs should their rights be found to have been violated. Mr. Searles was substituted as a Defendant on the theory that as Commissioner of Personnel, he would have the legal authority to reinstate Plaintiffs' status as classified employees should they prevail in their suit.

---

**4.** This action was originally filed against William Sorrell, State of Vermont Secretary of Administration, and the State of Vermont. Early on in the trial, Defendants moved to dismiss the action as against Mr. Sorrell because he was an improper party. The Court granted Defendants' motion, finding that Secretary Sorrell was in fact an improper party, given that Plaintiffs' Complaint concerned legislative action, and that as

Plaintiffs claim that Section 238a violates their rights under the Fourteenth Amendment. More specifically, they contend that: (1) the Legislature's reclassification decision was an individual determination targeted at Plaintiffs, and the method by which the Legislature converted Plaintiffs' status violated their procedural due process rights; (2) the Legislature's reclassification decision was not a proper legislative reorganization, but was instead pretextual and therefore violative of their substantive due process rights; and (3) the Legislature's reclassification was not rationally related to a legitimate state interest, and thus violated their right to equal protection.

This Court rejects all three of Plaintiffs' contentions because Plaintiffs have failed to prove that the reclassification embodied in Section 238a was anything other than a proper, general policy change rationally related to the legitimate interest of enhanced efficiency in government service.

*A. Procedural Due Process Claim*

■ Plaintiffs claim that the Legislature's reclassification of their positions denied them of due process of law in violation of the Fourteenth Amendment. The Fourteenth Amendment provides, in relevant part, that "no person shall be deprived of property without due process of law." U.S. Const. Amend. 14. Due process analysis requires that the Court determine if there is a protected life, liberty or property interest, and if so, what amount of process is required before one is deprived of such an interest. The parties do not dispute that the right to just cause employment in this case is a property interest for purposes of the Due Process Clause. *See Perry v. Sindermann,* 408 U.S. 593, 602–03, 92 S.Ct. 2694, 2700, 33 L.Ed.2d 570 (1972); *Board of Regents v. Roth,* 408 U.S. 564, 573, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972). The question presented, therefore, is whether the Legislature accorded the requisite process to Plaintiffs.

■ In general, "the legislative determination provides all the process that is due." *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 433, 102 S.Ct. 1148, 1156, 71 L.Ed.2d 265 (1982); *see also Atkins v. Parker,* 472 U.S. 115, 127, 105 S.Ct. 2520, 2527, 86 L.Ed.2d 81 (1985) (holding there was no violation of due process where Congress made a system-wide change in the method of computing Food Stamp eligibility without affording recipients a hearing); *Story v. Green,* 978 F.2d 60, 63 (2d Cir.1992) (having enacted statute that creates right to public benefits, legislature retains power to enact new legislation altering or eliminating the right). A legislative determination may therefore be made without affording affected parties notice or the opportunity to be heard as must usually be done before depriving someone of a protected interest. *See Bi–Metallic Inv. Co. v. State Bd. of Equalization,* 239 U.S. 441, 445, 36 S.Ct. 141, 142, 60 L.Ed. 372 (1915); *Pro–Eco, Inc. v. Board of Comm'rs of Jay County, Ind.,* 57 F.3d 505, 513 (7th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 672, 133 L.Ed.2d 522 (1995); *Richardson v. Town of Eastover,* 922 F.2d 1152, 1158 (4th Cir.1991); *see also Interport Pilots Agency, Inc. v. Sammis,* 14 F.3d 133 (2d Cir.1994). "Fairness (or due process) in legislation is satisfied when legislation is enacted in accordance with the procedures established in the state constitution and statutes for the enactment of legislation." *Richardson,* 922 F.2d at 1158.

■ As Plaintiffs argue, however, this general rule is only true when the legislature modifies statutory entitlements on a class-wide basis or otherwise enacts generally applicable laws. As the Court states in *Logan,* the principle that legislative determination satisfies due process requirements is not dispositive if due process is invoked to "protect[ ] the individual citizen from state action that is wholly arbitrary or irrational." 455 U.S. at 433, 102 S.Ct. at 1156. Similarly, the Court in *Atkins* reasoned that that case "does not concern the procedural fairness of individual eligibility determinations [but instead] involves a legislatively mandated substantive change in the scope of the entire program." 472 U.S. at 129, 105 S.Ct. at 2528. *Atkins* suggests further that legislative determination may be inadequate if a defect in the legislative process is claimed. *Id.* at 129, 130, 105 S.Ct. at 2528–29; *see also Story,* 978 F.2d at 63 (citing *Atkins* and reiterating that the general rule applies "ab-

sent any indication of some defect in the legislative process"). Thus, a due process claim is available when the legislature deprives property rights with legislation targeted at a particular individual or group of individuals, or that was adopted during the course of a legislative process that was somehow defective. Plaintiffs allege that both grounds for a due process claim are available in this case.

### 1. *Purpose of Section 238a*

■ Plaintiffs' argument that Section 238a was targeted specifically at them, as individuals, is based in large part on the contention that Secretary Sorrell acted improperly in introducing Section 238a into the Legislature. Plaintiffs contend that Secretary Sorrell acted without authority, and that he acted in bad faith and out of personal animus toward Plaintiffs. That Secretary Sorrell acted without authority is, they argue, evidence of his improper motive.

Plaintiffs have failed to demonstrate that Secretary Sorrell acted without authority in initiating Section 238a. As discussed above, the Secretary of Administration is vested with broader statutory powers within the Executive branch than are other agency secretaries, thereby empowering him to participate in policymaking across all five agencies of state government. These powers include authority to issue, with the approval of the governor, "general policy statements and general rules and regulations applicable to the executive branch of the state government to implement executive orders or legislative mandate," Vt.Stat.Ann. tit. 3 § 2222(a)(2) (1995), as well as the authority to, upon request, "advise the governor and the legislature on all matters relating to general administration." *Id.* at § 2222(a)(3). Secretary Sorrell's conduct in introducing Section 238a quite arguably falls within this statutory mandate of authority, and Plaintiffs have failed to prove otherwise.

Plaintiffs have argued that the manner in which Secretary Sorrell presented the idea for Section 238a to the Legislature exceeded even this broad scope of authority, and intruded upon the statutory authority vested in the Secretary of Transportation.[5] Thus, Plaintiffs argue, Secretary Sorrell's conduct violated the statutory duty imposed on all members of the governor's cabinet to "implement a program of continuing coordination and improvement of the activities carried on at all levels of state and local government." Vt.Stat.Ann. tit. 3 § 2102 (1995). As the statutory provisions relied upon by Plaintiffs point out, the Secretary of Administration's broad powers are constrained by the authority vested in other agency secretaries and by the duty to coordinate all activities with other state government agencies. However, Plaintiffs have not demonstrated, by a preponderance of the evidence, that Secretary Sorrell's conduct went beyond the bounds of his authority.

■ Moreover, even if Secretary Sorrell did act without authority, Plaintiffs have failed to demonstrate that such conduct was motivated by bad faith. Plaintiffs contend that the Court may impute improper motive to Secretary Sorrell from the fact that he deliberately failed to discuss the reclassification idea with Secretary Garahan prior to its introduction, thereby depriving Secretary Garahan of the opportunity to testify on the matter, that he failed to raise the issue at a cabinet meeting, and that he improperly interfered with the affairs of another state agency. The Court declines to infer improper motive from these facts. Even assuming, *arguendo*, that Secretary Sorrell acted beyond the scope of his statutory authority as Secretary of Administration, this does not in itself demonstrate improper motive, or more importantly, that Section 238a was targeted at Plaintiffs as individuals. Absent some additional proof, Secretary Sorrell's motive is presumed to have been proper.

The preponderance of the evidence demonstrates that Secretary Sorrell's motive was in fact proper. Secretary Sorrell testified to a number of policy justifications for Section 238a, all of which he represented to members of the Legislature when he first approached them with the idea. Secretary Sorrell's

---

**5.** The Secretary of Transportation is authorized to "organize, reorganize, transfer, or abolish sec-tions and staff function sections within the agency." Vt.Stat.Ann. tit. 19 § 7(f)(7) (1987).

avowed purpose in seeking passage of Section 238a was to make the Agency of Transportation more responsive and more accountable. The legislation was targeted at specific positions within the Agency of Transportation, but according to Secretary Sorrell, was not targeted at the individuals holding those positions. Senators Mazza and Metcalf both testified that this was the stated purpose of Section 238a that Secretary Sorrell conveyed to them. In short, there has been no credible indication of improper motive on the part of Secretary Sorrell.

■ Plaintiffs' most concrete argument is that Secretary Sorrell was angry at Plaintiff Conway due to an incident that took place the week of May 24, 1994, two weeks prior to the insertion of Section 238a into Act 210. The incident occurred during a hiring freeze in 1994, ordered by Secretary Sorrell. The Agency of Transportation sought a waiver of the freeze in order to hire a chemist. When that application for waiver was denied, Plaintiff Conway sent an e-mail message to the Commissioner of Personnel, with a copy to Secretary Sorrell, stating that an asphalt plant had been closed down due to the lack of the chemist. Secretary Sorrell, who interpreted this message as an attempt to pressure the Commissioner of Personnel to grant the waiver,[6] was displeased both by the content of the message and by the method by which it was delivered, and he mentioned this example to members of the Government Operations Committee as one reason for the four positions in question to be reclassified.

While Plaintiffs characterize this incident as proof of Secretary Sorrell's intention to single them out, Defendants contend that the incident was one of several legitimate reasons given to members of the Government Operations Committee for reclassifying the four positions. Secretary Sorrell testified that he mentioned the incident as an indica-tion that the Agency of Transportation "seemed to be marching to the beat of a different drummer." Plaintiffs urge the Court to infer personal animus from this event and from the timing of the incident with respect to the introduction of Section 238a into the Legislature, but have failed to provide sufficient evidence to permit such an inference. Even the coincidence in timing is inconclusive, in light of Secretary Sorrell's statement that he conceived of the idea for Section 238a as early as February of 1994. Thus, while Plaintiffs' scenario is plausible, Plaintiffs have failed to demonstrate, as is their burden, that it is more probable than not.

## 2. The Legislative Process

■ Plaintiffs' challenge to the Legislature's passage of Section 238a poses the question of whether the Committee of Conference's insertion of Section 238a into the Appropriations Bill was proper. The Court finds that it was. So long as legislation is generally applicable rather than specifically targeted at individuals, as the Court has determined Section 238a to have been, the Legislature need only conform to "the procedures established in the state constitution and statutes for the enactment of legislation." *Richardson v. Town of Eastover*, 922 F.2d 1152, 1158 (4th Cir.1991). The Legislature followed all constitutional and statutory procedures, and thereby afforded all the process that was due.

When the Committee of Conference's report was sent to the House, and then to the Senate, it was properly voted upon and passed by each legislative chamber, thus satisfying the requirements of Chapter II, § 6 of the Vermont Constitution.[7] In addition, Act 210 included an enactment clause, as required by Chapter II, § 10 of the Vermont

---

6. The decision to close the paving plant was, in actuality, not made by Plaintiff Conway, but instead by Robert Cauley, a manager in another division of AOT. Mr. Cauley apparently closed the plant for health and safety reasons that arose in the absence of a supervising chemist.

7. Chapter II, § 6 of the Vermont Constitution provides in pertinent part:

The Senate and the House of Representatives shall be styled, *The General Assembly of the State of Vermont*. Each shall have and exercise the like powers in all acts of legislation; and no bill, resolution, or other thing, which shall have been passed by the one, shall have the effect of, or be declared to be, a law, without the concurrence of the other.

Constitution. *See* Defendants' Exh. J.[8] The legislative process therefore conformed with the constitutional requirements for the enactment of legislation.

 While violation of a legislative rule might also constitute a defect in the legislative process, no such violation occurred in the passage of Section 238a. Legislative rules are judicially cognizable, and may therefore be enforced by the courts. *Yellin v. United States*, 374 U.S. 109, 114, 83 S.Ct. 1828, 1832, 10 L.Ed.2d 778 (1963) (overturning a criminal contempt conviction because the House Un–American Activities Committee had failed to follow its own rules); *see also Christoffel v. United States*, 338 U.S. 84, 69 S.Ct. 1447, 93 L.Ed. 1826 (1949). The opportunity for such enforcement is not presented in this case.

Although the Committee of Conference for Act 210 was convened to resolve differences between the House and Senate's competing versions of the Appropriations Act, the Committee's insertion of Section 238a into the Act did not violate legislative rules. The Joint Rules of the Senate and House of Representatives provide: "In every case of disagreement between the Senate and House of Representatives, if either shall request a conference, and appoint a committee *for that purpose,* the other house shall also appoint a committee on its part." Defendants' Exh. O (emphasis added). The language "for that purpose" refers back to "disagreement between the Senate and House of Representatives," and therefore the scope of the Committee of Conference's authority is circumscribed by the differences between the House and Senate versions of the bill in question. Exceeding the scope of the Committee's authority, however, does not necessarily invalidate the Committee's report. Rather, the Committee's report is merely

objectionable, and any objection must be timely made:

> The report of a conference committee is objectionable in form if the committee has not confined itself to differences of opinion between the houses. Objection to form must be made at the time the report is introduced, and if not made at that time is not in order at a later period.

Mason's Manual of Legislative Procedure § 771 par. 2 (West 1989). Moreover, the breaking of a legislative rule effects the suspension of it. *Id.* at § 24(3).[9]

H. 864, the bill referred to the Committee of Conference in this case, was an appropriations bill to which Section 238a bore at best tangential relation. Although the scope of appropriations bills such as H. 864 is expansive, it is far from clear that Section 238a was within the delegated authority of the Committee of Conference. But even assuming that the Committee's report, which included Section 238a, was beyond the scope of its authority, the process was not defective; since no objection was made in either the House or the Senate upon introduction of the report into the respective chambers of the Legislature, all objections are deemed waived, and Section 238a is considered to have been properly incorporated into the Committee's report.

 Plaintiffs have argued that the legislative process was defective because Plaintiffs were not given notice of Section 238a and were not given adequate opportunity to address the Legislature prior to its passage. In addition, Plaintiffs contend that the process was constitutionally flawed because Section 238a was never formally considered by a standing committee before being voted upon. The Legislature is not required, by constitutional provision, by statute, or by legislative rule, either to give notice or to hear bills in

---

**8.** Defendants referred to the enactment clause requirement in their memorandum in support of their motion for judgment on partial findings. Plaintiffs misunderstood the reference as referring to a statement of legislative intent for Act 210, Defendants' Exh. J, and argued that that statement contained erroneous statements. The statement of legislative intent is not, however, a constitutional or statutory requirement for the enactment of legislation.

**9.** Mason's Legislative Manual § 24, entitled "Failure of a House of the Legislature to Conform to Its Rules Does Not Invalidate Its Acts," states in pertinent part, "3. A rule is virtually repealed for the occasion when it is disregarded by those who have the power to control it; and the act of breaking it is at least a suspension of it."

standing committees,[10] and therefore these arguments could only succeed if the legislation was found to be targeted at the four division directors *as individuals.* Only then would the Court consider whether notice, hearing, or other processes were required. Since the Court has found Section 238a to concern the four director positions rather than their incumbents, the legislative determination itself satisfies procedural due process requirements.

What Plaintiffs ask is that the Court require the Legislature to provide notice and to hold hearings on all legislation that it considers. While there may be merit to such a proposal as a matter of policy, it is not for the Court to dictate rules for the Legislature to follow.

> [The Legislature] may not by its rules ignore constitutional restraints or violate fundamental rights, and there should be a reasonable relation between the mode or method of proceeding established by the rule and the result which is sought to be attained ... [b]ut within these limitations all matters of method are open to the determination of the [Legislature] and it is no impeachment of the rule to say that some other way would be better, more accurate, or even more just.

*United States v. Ballin,* 144 U.S. 1, 5, 12 S.Ct. 507, 509, 36 L.Ed. 321 (1892). Indeed, separation of powers considerations preclude the courts from acting as arbiters of legislative procedure. *Greenberg v. Bolger,* 497 F.Supp. 756, 773 (E.D.N.Y.1980).

In light of the fact that Plaintiffs have failed to prove either that Section 238a was targeted at the four division directors as individuals, or that there was a defect in the legislative process, the Court finds that Plaintiffs' rights to procedural due process were not violated by the enactment of the legislation in question.

### B. Substantive Due Process Claim

In addition to the procedural due process claim, Plaintiffs allege that the Leg-islature's action violated their substantive due process rights under the Fourteenth Amendment. Substantive due process "bars certain arbitrary, wrongful government actions 'regardless of the fairness of the procedures used to implement them.'" *Foucha v. Louisiana,* 504 U.S. 71, 80, 112 S.Ct. 1780, 1785, 118 L.Ed.2d 437 (1992) (quoting *Daniels v. Williams,* 474 U.S. 327, 331, 106 S.Ct. 662, 664, 88 L.Ed.2d 662 (1986)); *see also Committee of United States Citizens Living in Nicaragua v. Reagan,* 859 F.2d 929, 943–44 (D.C.Cir.1988) ("substantive due process prevents 'governmental power from being used for purposes of oppression,' or 'abuse of government power that shocks the conscience,' or action that is 'legally irrational [in that] it is not sufficiently keyed to any legitimate state interests'") (citations omitted). Under the doctrine, state action that does not impair a fundamental right or single out a suspect classification must not be arbitrary, *Lowrance v. Achtyl,* 20 F.3d 529, 537 (2d Cir.1994), and must be rationally related to a legitimate state interest. *Catlin v. Sobol,* 93 F.3d 1112, 1119 (2d Cir.1994). The party complaining of the due process violation bears the burden of "establish[ing] that the legislature has acted in an arbitrary and irrational way." *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976).

Plaintiffs have failed to demonstrate that Secretary Sorrell, or by imputation the Legislature, acted in an arbitrary or irrational way. Rather, the evidence presented to the Court supports the conclusion Secretary Sorrell and the Legislature's actions were rationally related to the legitimate government interest of improving the performance of the Agency of Transportation. Plaintiffs allege that the rationale for Section 238a advanced by Secretary Sorrell was merely pretext for his true intent of depriving Plaintiffs of their job security, but they have been unable to demonstrate that Secretary Sorrell's motives were any different from those to which he testified and which he conveyed to various legislators in advocating for Section 238a.

---

**10.** House and Senate rules establish committees and define their jurisdictions, but do not require that bills be referred to a standing committee before being voted upon on the floor of the chamber.

Secretary Sorrell stated in his testimony that he had advocated the reclassification of the four division director positions on the basis of a host of structural and performance grounds. He noted that unlike the other agencies of state government which have several departments, each headed by an exempt commissioner, AOT consists of only one department and four divisions. In addition, he stated that the four division directors in question in AOT, like commissioners in other agencies, and like the Commissioner of Motor Vehicles, report directly to the Secretary. Moreover, he noted that the number of employees supervised by the affected division directors and the sizes of their respective budgets are far larger than those of comparable divisions directors in other state agencies. Therefore Secretary Sorrell acted, according to his testimony, to bring AOT into conformity with the administrative structure predominant in the rest of state government.

Secretary Sorrell testified further that he believed such structural change was necessary to remedy performance weakness at AOT. He stated that AOT had been the subject of criticism for nepotism, improper contracting practices, and gender bias; its accounting practices were deficient; and its performance lagged behind that of other state agencies. Defendants have also argued that the history of managerial problems at AOT was well-known among legislators, as evidenced by the Canby Report commissioned by the Legislature in 1990.

Secretary Sorrell stated that Section 238a was intended to improve performance at AOT by creating an exempt management team comparable to those in place at other state agencies. He contended that persons holding high-level exempt positions tend to be more responsive to elected officials and to the public than do classified employees, and that the legislation would serve the additional purpose of sending a "signal" to AOT that its performance must be improved.

Secretary Sorrell conveyed these motivations to members of the Legislature, several of whom testified at trial and confirmed that Secretary Sorrell had presented his idea for Section 238a as a means of increasing AOT's responsiveness and accountability. All the evidence presented to the Court suggests that Section 238a was considered by the Legislature on its merits, and not as a means of depriving Plaintiffs of their status as classified employees.

It cannot be disputed that improving the performance and efficiency of a state agency is a legitimate government interest. It is also clear to the Court that Section 238a was a rational means of achieving that end. Plaintiffs may raise the question of whether Section 238a was good policy, but they have failed to demonstrate that it was irrational. For example, Plaintiffs have argued that the legislative action was not rationally related to improved performance because Section 238a converted only four of the five division director positions in AOT. However, Secretary Sorrell explained in his testimony that he made his decision in large part upon examination of an organizational chart of AOT, Defendants' Exh. D, which showed the fifth division director—Director of Rail, Air & Public Transportation—reporting to the Deputy Secretary of Transportation, who in turn reports to the Secretary, while the other four division directors reported directly to the Secretary. From this he concluded that the four division directors affected by Section 238a were more comparable to department commissioners than was the Director of Rail, Air & Public Transportation. While Plaintiffs have presented evidence challenging the accuracy of this conclusion, the conclusion itself could rationally be drawn. Plaintiffs' own expert witness on personnel issues and governmental structure, Jay Wisner, conceded that the conclusion was not irrational.

Much of the evidence presented by Plaintiffs similarly raises questions of the wisdom of Section 238a, but fails to demonstrate its irrationality. For example, Plaintiffs argue that if the Legislature truly wanted to make AOT more structurally similar to other state agencies, it could have grouped the four divisions affected by Section 238a into a single department, headed by a commissioner to whom the four division directors would report. Plaintiffs' Memorandum in Opposition to Defendants' Motion for Judgment on Partial Findings at 26 (Paper No. 37). Reasonable people may disagree as to whether

Plaintiffs' proposal or Section 238a best achieves uniformity of state agency structure, but this does not in itself demonstrate arbitrariness or irrationality on the part of the Legislature.

### C. Equal Protection Claim

 Plaintiffs' third and final claim is that the reclassification of their positions was a violation of their right to equal protection because they were treated differently from other similarly situated state employees, without legitimate reason. Defendants contend that the reclassification was a legitimate exercise of legislative discretion.

 When a classification involves neither fundamental rights nor a suspect class, it survives equal protection scrutiny if it is rationally related to a legitimate state interest. *New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 2516–17, 49 L.Ed.2d 511 (1976). Here, Plaintiffs and Defendants agree that rational basis analysis applies. Plaintiffs allege that the Legislature's action was violative of their equal protection rights in two respects. First, Plaintiffs allege the reclassification treats them differently from other civil service employees whose positions have not been made exempt, and that the Defendants' asserted purpose of the change—to have Plaintiffs serve at the pleasure of he Secretary of Transportation—is not a valid public purpose. Second, Plaintiffs argue that the Legislature's refusal to grandfather Plaintiffs as it had done in the past for other public employees whose positions had been transferred from classified to exempt status treated them differently than similarly situated persons, without legitimate reason.

The Court's finding that the Legislature's reclassification of the four positions was rationally related to a legitimate government interest, as discussed in the substantive due process analysis above, applies with equal force in the context of equal protection analysis. Equal protection and substantive due process are of course analytically distinct concepts, but the outcome under both analyses is the same in this case. Thus, the Legislature's reclassification of the four affected positions did not violate Plaintiffs' right to equal protection.

Nor did the Legislature's refusal to grandfather the incumbents of the four affected positions violate Plaintiffs' equal protection rights. Plaintiffs have argued that the Legislature lacked a rational basis for refusing to grandfather the four positions and have noted that in all previous instances of legislative conversion of classified positions, including a conversion of positions during the 1994 legislative session, the Legislature had protected the incumbents through the inclusion of grandfathering language. In his testimony at trial, Secretary Sorrell stated that he opposed the grandfathering proposal because he felt that it would reduce the beneficial impact of Section 238a and run counter to the ends of greater efficiency and accountability. He also testified that he shared this opinion with several legislators. Secretary Sorrell's rationale survives equal protection scrutiny, as it is rational to believe that greater responsiveness among the four affected directors would not be achieved if the incumbents maintained their classified status. The fact that the Legislature has in the past grandfathered incumbents does not require grandfathering in all cases, nor does it render the Legislature's decision not to do so in this case irrational.

### III. Conclusion

Based on the foregoing analysis, Defendants' Motion for Judgment on Partial Findings (Paper No. 36) is hereby GRANTED.