THE VERMONT ASSEMBLY OF HOME HEALTH AGENCIES, INC., on behalf of its 13 Medicare-certified, non-profit Home Health Agencies; and the Visiting Nurse Alliance of Vermont and New Hampshire, Inc., Plaintiffs,

v.

Donna SHALALA, Secretary, United States Department of Health and Human Services, Defendant.

No. 2:98–CV–128.

United States District Court, D. Vermont.

Aug. 26, 1998.

Philip Howell White, Law Offices of Wilson & White, P.C., Montpelier, VT, for Plaintiffs.

Nancy J. Creswell, Asst. U.S. Atty., Burlington, VT, for Defendant.

Donelle Smith Staley, Vermont Atty. General's Office, Human Services Div., Waterbury, VT, Christopher LaBonte White, Vermont Atty. General's Office, Department of Social & Rehab. Services, Waterbury, VT, William Richard Dysart, Vermont Senior Citizen Law Project, Burlington, VT, for Movants.

*OPINION AND ORDER*

SESSIONS, District Judge.

Plaintiff home health agencies challenge the constitutionality of an interim reimbursement scheme for Medicare home health services in the Balanced Budget Act of 1997 ("BBA"), Pub.L. No. 105–33, § 4602, *to be codified at* 42 U.S.C. § 1395x(v)(1)(L). They seek a preliminary injunction against the implementation of this scheme. Plaintiffs also move to amend the complaint to join four individual plaintiffs, Medicare beneficiaries who receive home health services. Defendant opposes both motions and moves to dismiss for lack of jurisdiction and for failure to state a claim. For the reasons cited below, Plaintiffs' Motion for Preliminary Injunction (Paper 2) is denied, Defendant's Motion to Dismiss (Paper 18) is granted, and Plaintiffs' Motion to Amend (Paper 24) is denied.

I. *Factual Background*

Under the Medicare program, home health agencies ("HHAs") are paid for providing services to eligible beneficiaries. Since the late 1980's, increased utilization of home health services and a marked leap in the number of visits per patient by HHAs have imposed a conspicuous burden on Medicare's budget. Congress responded with the BBA on August 5, 1997, which altered the method of reimbursing HHAs.

Prior to the BBA's passage, HHAs were paid on a cost reimbursement basis. The Health Care Financing Agency ("HCFA"), the division of the Department of Health and Human Services ("HHS") charged with administering Medicare, paid HHAs retrospectively for the reasonable costs they incurred so long as those costs fell beneath a per visit cost limit. Since 1980 Congress has placed no limit on the number of visits an HHA could make to one patient.

While the cost reimbursement plan was in place, the State of Vermont developed a network of community-based nonprofit HHAs, each of which it franchised to provide services in a specific region. The network now consists of thirteen agencies, and the State has not allowed any competing HHAs to enter the marketplace. It is the mission of these HHAs to offer comprehensive home health services to all Vermonters regardless of ability to pay. Local boards govern the HHAs, which receive some funding from the communities in their area, and Plaintiff Vermont Assembly of Home Health Agencies, Inc. ("VAHHA"), coordinates interagency assistance. This unique structure has enabled Vermont's HHAs to deliver home health services efficiently, to a greater percentage of eligible beneficiaries at a lower cost per visit than many other states.

Nationally, however, the costs of Medicare home health coverage skyrocketed over the course of the 1980's and 1990's. *See* Office of Inspector General, Dep't of Health and Human Services, *Operating Practices of High-cost and Low-cost Home Health Agencies* 1 (1997) (Medicare home health service spending rose from $ 3.3 billion in 1990 to $ 15 billion in 1995). Overall Medicare spending was rising dramatically, and home health care commanded an ever-increasing share of the Medicare pie. *See Medicare Home Health Care: Hearing Before the Subcomm. on Health and Env't of the House Comm. on Commerce*, 105th Cong. 4 (1997) (statement of Rep. Burr) (citing the need for reform of the home health system in order to extend the life of Medicare trust funds). Without a limit on the number of visits made to each patient, the average number of home health visits paid to Medicare beneficiaries leapt from 26 visits per beneficiary per year in 1989 to 76 visits per year in 1996. H.R.Rep. No. 105–149 (1997), *reprinted in* 1997 WL 353017, at *2785–86.

Other factors contributed to the increased utilization of home health services, including advances in technology allowing more patients to be treated at home, mounting patient preference for home health care, and similar encouragement from hospitals. Hospitals during this time had moved to a prospective Medicare reimbursement plan and sought to limit the services they provided to Medicare beneficiaries. These years also witnessed the arrival of many new HHAs, of which a substantial number were private organizations. Health, Education, and Human Services Division, General Accounting Office,

*Home Health Utilization Expands While Program Controls Deteriorate* 2 (1996) (83% of new Medicare-certified HHAs between 1989 and 1994 were proprietary).

These trends led Congress to perceive an overutilization of Medicare home health services, aided by "relatively generous payments, coverage policies, and little oversight." H.R.Rep. No. 105–149 at *2708. Congress believed that across the country HHAs likely were abusing the reimbursement system by making more visits than necessary. As resources for government supervision of the program had diminished during this time, the potential for HHA fraud had grown.

These concerns resulted in the changes set out in the BBA. This statute substitutes for the cost reimbursement program a prospective payment system ("PPS"), marking a shift in schemes similar to that which hospitals underwent earlier. The PPS will award HHAs a predetermined level of reimbursement, thereby offering incentives for HHAs to limit spending.

The PPS is to be implemented beginning with cost reporting periods on or after October 1, 1999, though some reimbursement may still be based on agency-specific costs for a transition period of up to four years. 42 U.S.C. §§ 1395fff(a), (b)(1). The HCFA requires time to devise an adequate case mix adjuster. A case mix adjuster will account for disparities between HHAs in terms of the relative complexity of the medical issues faced by the beneficiaries they serve.

The BBA calls for an Interim Payment System ("IPS") to govern pending the implementation of the PPS. Congress found that the overutilization of and excessive spending on Medicare home health services demanded immediate action, though an adequate case mix adjuster had not yet been prepared. *See Medicare Home Health Care* at 15–16 (statement of Bruce Vladeck, Administrator,

HCFA). The IPS was seen as a necessary stopgap to control wasteful Medicare spending until the PPS took effect. *See id.* at 15 (while PPS is developed, HCFA "propose[s] to implement some interim changes ... that would allow us to achieve additional cost control"); Nancy–Ann Min DeParle, Dep't of Health and Human Services, *BBA Home Health Care Provisions* 5 (1998) (statement before Senate Aging Comm.) ("The [IPS] was established to control the runaway growth in home health while HCFA works to develop an accurate case-mix adjuster").

The IPS retains the structure of the cost reimbursement system in that HHAs are entitled to the lowest of several figures, two of which are holdovers from the previous scheme: the agency's reasonable costs and a reduced annual per visit cost limit. The third figure, an aggregate per beneficiary limitation, is new. The aggregate per beneficiary limit is derived from a blend of an HHA's reasonable costs for fiscal year 1994 and the regional average of such costs for that year.[1] Agencies without measurable costs in 1994 take a median of the limits determined for other HHAs.

The IPS is projected to save the Medicare program billions of dollars over its two-year existence. *See* H.R.Rep. No. 105–149 at *2851 (per beneficiary limit and lowered per visit cost limits predicted to bring $11.3 billion in savings). By tightening the per visit limit and introducing a per beneficiary limit, the IPS aims to harness abusive HHA practices. HHAs that made excessive visits and overcharged for services in the base year of 1994, though their costs may have increased since that year, will presumably be able to meet the per beneficiary limit through closer monitoring of visits and expenditures. Efficient HHAs will find that task more burdensome. If an agency was spartan in its delivery of services in 1994, its per beneficiary limit will be accordingly low. Not only will

---

1. The per beneficiary annual limitation is calculated by multiplying two figures: one based "75% on 98% of the reasonable costs (including non-routine supplies) for the agency's twelve month cost reporting period ending during the fiscal year 1994, and based 25% on 98% of the standardized regional average of such costs for the agency census division, as applied to such agency for the cost reporting periods ending during fiscal year 1994, such costs updated by the home health market basket index," and the other based on "the agency's unduplicated census count of patients (entitled to benefits under this title) of the cost reporting period subject to the limitation." 42 U.S.C. § 1395x(v)(1)(L).

the limit be lower than that of other HHAs, but such agencies will have less superfluous spending to eliminate in order to reach that limit.

Fluctuations in case mix may exacerbate the plight of the low cost, efficient HHA. If an agency treats more high care Medicare beneficiaries now than in 1994, it may struggle to bring its per beneficiary costs within IPS strictures. Where an inefficient HHA would have a higher limit and could more easily adjust to a different case mix, an efficient agency may find its solvency threatened by the combination of a low per beneficiary figure to meet and a more demanding clientele than in 1994.

Vermont's HHAs face just these concerns. (Paper 14 ¶¶ 9–12.) Their per beneficiary limits may be inadequate. By contrast, high cost HHAs that were inefficient or abusive of the old reimbursement system will, in spite of their past practices, enjoy sizable per beneficiary limits within which they can both provide necessary services and profit. The HHAs most responsible for the waste which necessitated the IPS stand to gain far more than Vermont's HHAs under this system.

Vermont's home health providers will not be able to stay within the per beneficiary limit by accepting fewer high cost Medicare patients, because they serve all Medicare-eligible patients in need of home health services. (Paper 11 ¶ 30.) The vast majority of Plaintiffs' patients are Medicare beneficiaries; private paying clients are not abundant enough to subsidize services delivered to others. The IPS jeopardizes the economic viability of Vermont's HHAs. Their Medicare patients, if forced to receive a lower level of home health service or if the provider in their region closes, may seek necessary treatment in hospitals or institutional care facilities. The increased popularity of institutional facilities would contradict Vermont state policy and impose a strain on Medicaid spending. (Paper 16 ¶¶ 17–20.)

Plaintiffs charge that the per beneficiary limit of the IPS is so imprudent as to be unconstitutional. Plaintiffs make several allegations: the IPS needlessly discriminates against "low cost, non-profit Medicare certified home health agencies in Vermont and elsewhere," in violation of the equal protection principles of the Fifth Amendment (Paper 11 ¶ 71); the system is so irrational as to violate substantive due process under the Fifth Amendment; the IPS deprives Plaintiffs of their economic viability contrary to the Fifth Amendment's Taking Clause; and it interferes with Vermont's unique home health system in violation of the Tenth Amendment.

On May 29, 1998, Plaintiffs moved to amend the Complaint and to join four individuals as Plaintiffs. Each individual currently receives Medicare-funded home health services. They each allege that the IPS threatens not only the solvency of Vermont's HHAs, but their own access to necessary home care as well.

## II. Discussion

### A. Motion to Amend

Plaintiffs seek to join four homebound Medicare beneficiaries as plaintiffs. They propose to amend the Complaint to reflect the beneficiaries' equal protection and unlawful taking claims, and to add factual allegations supporting a class action on behalf of Medicare-funded HHA patients.

■ Fed.R.Civ.P. 20(a) permits "[a]ll persons [to] join in one action as plaintiffs if they assert any right to relief jointly, severally, or in the alternative in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all these persons will arise in the action." In joinder determinations, "the impulse is toward entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged." *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 724, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), *quoted in Wyant v. National R.R. Passenger Corp.*, 881 F.Supp. 919, 921 (S.D.N.Y.1995).

■ Amendment of a complaint may be granted by the Court in its discretion "when justice so requires." Fed.R.Civ.P. 15(a). Leave to amend is normally awarded absent "any apparent or declared reason—such as

... futility of amendment." *Upper Valley Ass'n for Handicapped Citizens v. Mills*, 928 F.Supp. 429, 433 (D.Vt.1996) (quoting *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)).

■ HHS challenges the motion to amend as futile. The first of its two arguments for futility challenges the beneficiaries' standing. To satisfy the case or controversy requirement of Article III of the Constitution a plaintiff must demonstrate that he or she has suffered an injury in fact, that the injury is fairly traceable to the challenged conduct of the defendant, and that the injury will likely be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

■ An injury in fact results from "an invasion of a legally protected interest which is (a) concrete and particularized ... and (b) actual or imminent, not conjectural or hypothetical." *Id.* at 560, 112 S.Ct. 2130 (citations omitted). The individual plaintiffs have alleged a concrete injury: the loss of medically necessary home health services. If Vermont's home health providers close from inadequate reimbursement, the beneficiaries will lack access to a Medicare-certified provider. These patients may have to forego some home services or enter institutionalized care.

This injury is sufficiently imminent. Plaintiffs' current per beneficiary spending exceeds that of 1994, at least in part because their case mix includes more high care patients. Home health service to the individual beneficiaries would be threatened as soon as the IPS is implemented. The fact that the injury is indirect or only anticipated is unavailing. *See Garelick v. Sullivan*, 987 F.2d 913, 919 (2d Cir.1993) (injury may be indirect product of government's conduct); *Heldman ex rel. T.H. v. Sobol*, 962 F.2d 148, 154–56 (2d Cir.1992) (since injury to due process would occur under provision of IDEA in question, plaintiff had standing to challenge statute).

The injury alleged can fairly be traced to passage of the IPS, and it is redressable through an injunction against enforcing this part of the BBA. The individual beneficiaries thus have standing to challenge implementation of the IPS.

HHS forges a second futility argument by asserting that the amended complaint, like the original, could not survive a motion to dismiss for failure to state a claim. The Court acts within its discretion if it denies leave to amend a complaint which even as amended would fail under Fed.R.Civ.P. 12(b)(6). *S.S. Silberblatt, Inc. v. East Harlem Pilot Block–Bldg. 1 Hous. Dev. Fund Co.*, 608 F.2d 28, 42 (2d Cir.1979).

■ The standing issue having been addressed, this second futility argument represents the sole basis for denying leave to amend. Leave to amend will only be denied if the beneficiaries would lose the motion to dismiss. Therefore the Court will consider the motion to dismiss, and its decision will determine the fate of the proposed amendment. If dismissal under Rule 12(b)(6) is justified against the original and proposed Plaintiffs, then leave to amend will be denied; if a claim is stated, the amendment will be granted. HHS has had an opportunity to argue for dismissal of both the original and the amended claims, and therefore it will not be prejudiced by the Court's consideration of the motions in this order. *See Deem v. Lockheed Corp.*, 749 F.Supp. 1230, 1235, 1235 n. 5 (S.D.N.Y.1989).

B. *Motion to Dismiss for Lack of Subject Matter Jurisdiction*

■ Defendant moves to dismiss this case based on lack of subject matter jurisdiction, pursuant to Fed.R.Civ.P. 12(b)(1). According to HHS, this case arises under the Medicare Act, which states: "No action ... shall be brought under section 1331 ... of Title 28 to recover on any claim arising under this subchapter." 42 U.S.C. §§ 405(h), 1395ii.

The Supreme Court distinguished between challenges against the amount of benefits awarded and "challenges mounted against the *method* by which such amounts are to be determined," in *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 675, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986) (emphasis in original) (validating subject matter jurisdiction over physicians' challenge to a

Medicare regulation). Disputes concerning the amount of benefits were to be settled pursuant to the administrative procedures laid out in the Medicare Act, not by turning to the courts. *Id.* at 677–78, 106 S.Ct. 2133. However, the *Michigan Academy* Court drew a distinction between amount and method, finding it "implausible to think [Congress] intended that there be *no* forum to adjudicate statutory and constitutional challenges to regulations promulgated by the Secretary." *Id.* at 678, 106 S.Ct. 2133 (emphasis in original). The Court turned to the presumption that Congress did not intend to bar all judicial review of executive action, stating that this presumption could only be defeated with clear and convincing evidence to the contrary. *Id.* at 680–81, 106 S.Ct. 2133. With respect to Section 405(h), the Court found that this presumption had not been overcome. *Id.* at 681, 106 S.Ct. 2133.

The Second Circuit has noted that the statutory scheme giving rise to the particular question in *Michigan Academy* has been altered, reducing the utility of the amount/method distinction. *See Abbey v. Sullivan,* 978 F.2d 37, 41–43 (2d Cir.1992). Nevertheless, this Circuit still recognizes that while disputes involving the calculation of an amount due should be left to administrative determination, the courts have subject matter jurisdiction over a challenge to "a rule of general applicability." *Cosgrove v. Sullivan,* 999 F.2d 630, 632 (2d Cir.1993). *See also Walsh v. McGee,* 899 F.Supp. 1232, 1237 (S.D.N.Y.1995) (court has jurisdiction over challenges to validity of Medicare rules or regulations); *Abbott Radiology Associates v. Sullivan,* 801 F.Supp. 1012, 1015–18 (W.D.N.Y.1992).

The instant claim does not concern a specific agency payment decision but the constitutionality of a new method for calculating reimbursement. This facial challenge to the validity of the IPS is collateral to the system's substantive application in a given instance. Therefore, Defendant's jurisdictional argument must fail. *See Greater Dallas Home Care Alliance v. United States,* No. 98–0768, slip op. at 9–10 (N.D. Tex., June 8, 1998).

Moreover, jurisdiction would be appropriate even if judicial review arose only under the Medicare Act. Defendant argues that under the Medicare Act Plaintiffs must exhaust their administrative remedies. Defendant contends that Plaintiffs fail to meet this requirement, citing a lack of presentment by the HHAs to HHS. Presentment, a non-waivable requirement of exhaustion, makes little sense when the claimant is mounting a collateral challenge to a regulation. *See Disabled Am. Veterans v. United States Dep't of Veterans Affairs,* 962 F.2d 136, 140 (2d Cir.1992) ("it . . . is clear that the Article III district courts have power to rule on the constitutionality of acts of Congress"). The HHAs did present their claim to the HHS in the form of written pleas from Governor Dean urging an exemption for Vermont from the per beneficiary limit. (Paper 23, Ex. A.) The agency's negative response makes it clear that the IPS will go forward in Vermont and that Plaintiffs have no administrative recourse. (Paper 30, Ex. 10.) As Plaintiffs have exhausted all administrative remedies that HHS is willing to provide, judicial review would be appropriate even under the Medicare Act. *See Nassau Nursing Home v. Heckler,* 614 F.Supp. 1091, 1095 (E.D.N.Y.1985) (since Secretary denied plaintiffs any opportunity for post-deprivation administrative hearing, plaintiff had effectively exhausted all remedies Secretary was willing to provide); *Greater Dallas* at 10.

### C. *Motion to Dismiss for Failure to State a Claim*

HHS also moves to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), charging that each of Plaintiffs' counts fails to state a claim. For the purposes of this motion, all factual allegations in the Complaint must be taken as true. Plaintiffs raise only legal issues concerning a statute's constitutionality. They can prove the law's invalidity based only on the considerations before Congress and judicially noticeable facts, not on other evidence showing that Congress was mistaken. As a result, no further factual analysis is required. *See Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 464, 101 S.Ct. 715, 66 L.Ed.2d 659

(1981); *Vance v. Bradley*, 440 U.S. 93, 111–12, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979).

The motion to dismiss will only be granted if it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). This standard will be applied to each of Plaintiffs' claims in turn.

### 1. *Equal Protection*

■ Equal protection doctrine ensures that all similarly situated persons are treated similarly under the law. If a statute classifies people, the classification must be based on criteria related to the statute's objective. *Disabled Am. Veterans*, 962 F.2d at 141.

### a. *Standard of Review*

■ A law which does classify people may be subject to various levels of equal protection scrutiny. Strict scrutiny is applied to acts burdening fundamental rights or targeting suspect classes. Suspect classes are those identified by race, alienage, or national origin. *Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Fundamental rights include those derived explicitly or implicitly from the Constitution itself. *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 33–34, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). To survive strict scrutiny, a statute must be suitably tailored to serve a compelling governmental interest. *Cleburne*, 473 U.S. at 440, 105 S.Ct. 3249. Intermediate scrutiny has been applied to laws involving two quasi-suspect classes: legitimacy and gender. Under intermediate scrutiny, a law must be substantially related to an important governmental interest. *Id.* at 441, 105 S.Ct. 3249. Economic or social welfare legislation receives rational basis review. *Disabled Am. Veterans*, 962 F.2d at 141.

■ Plaintiffs submit that their equal protection claim should invoke strict scrutiny because access to medically necessary and reasonable home health care is a "basic necessity," the IPS burdens the class of indigents, and the law infringes on the elderly's right to freely migrate. (Paper 26 at 7.) Failing that, Plaintiffs argue that a heightened level of scrutiny should pertain, as the IPS has a detrimental impact on rights verging on the fundamental or classes of persons who have suffered some societal prejudice but do not belong to suspect classes. *Long Island Lighting Co. v. Cuomo*, 666 F.Supp. 370, 414 (N.D.N.Y.1987).

■ Neither strict nor intermediate scrutiny apply, as the IPS concerns no recognized suspect or quasi-suspect class, nor any fundamental right. The IPS does not on its face classify the indigent or discriminate between states; it imposes a Medicare reimbursement scheme for all HHAs. As for Plaintiffs' three theories, first, the Supreme Court found access to necessary and reasonable health care a "basic necessity," but did not recognize an independent right to such services. *Memorial Hosp. v. Maricopa County*, 415 U.S. 250, 259, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974). Rather, this statement came within the discussion of the right to travel. *Id.* Second, while laws classifying on the basis of wealth may draw closer attention than others, the indigent are not a suspect or quasi-suspect class. *San Antonio Indep. Sch. Dist.*, 411 U.S. at 28–29, 93 S.Ct. 1278.

Third, the connection to the right to travel is tenuous. The challenged statute is not a state law separating one state from others, as in *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) (invalidating three state laws as violative of the right to travel), but a Congressional act enforced nationwide. This law implements the same reimbursement system in all states. While Vermont HHAs may suffer worse than those of other states because they are all low cost, nonprofit agencies, all states cannot be readily broken down into clear winners and losers under the IPS. That nineteen states stand to receive a much higher "*average* reimbursement per beneficiary" than all the others, (Paper 26 at 7 n. 2) (emphasis added), only reinforces the fact that the IPS regulates agencies, not states. Even those nineteen states that benefit on average may contain low cost, efficient HHAs that will struggle. The IPS does not implicate the right to

migrate between states, and strict scrutiny is not warranted.

Plaintiffs' alternative argument calls for heightened scrutiny because the IPS affects rights and classes that verge on the fundamental or suspect. *Long Island Lighting,* 666 F.Supp. at 417. Plaintiffs rely on a Northern District of New York decision, in a case which was settled before it reached Second Circuit review. *See Long Island Lighting Co. v. Cuomo,* 888 F.2d 230, 233, 234 n. 5 (2d Cir.1989) (Second Circuit did not vacate the equal protection claim as it had not been appealed, but dismissed the case as moot due to settlement between the parties). The district court's decision discussed the varying degrees of deference accorded to equal protection review, particularly rational basis review, at a time eleven years ago when the Supreme Court's rational basis scrutiny appeared to be unusually probing. *Long Island Lighting,* 666 F.Supp. at 414. The Northern District of New York professed that near-suspect classes or near-fundamental rights should receive not heightened scrutiny, as Plaintiffs suggest, but a "more searching rational basis analysis." *Id.* at 421.

It is the opinion of this Court that rational basis review, not heightened scrutiny, is most appropriate. As to the degree of scrutiny, the Court will conduct its inquiry into rational basis in the manner it believes appropriate given the Supreme Court's and Second Circuit's guidance in this area of the law as a whole.

The IPS is a fitting candidate for rational basis review, as it is alleged to single out low cost, efficient HHAs. This act exemplifies the type of social welfare legislation designed to receive rational basis review. *See Rye Psychiatric Hosp. Ctr., Inc. v. Shalala,* 52 F.3d 1163, 1172 (2d Cir.1995) (alleged equal protection violation in Medicare reimbursement scheme reviewed for rational basis, as "[l]egislation in the economic and social welfare area, which includes Medicare, is tested under a deferential standard of review").

b. *Rational Basis Review*

■ At the outset of this inquiry, the challenged statute is presumed constitution-

al. *Cleburne,* 473 U.S. at 440, 105 S.Ct. 3249. The law survives rational basis review if its classification bears a rational relationship to a legitimate governmental objective. The classification may not be found unconstitutional simply because it "is not made with mathematical nicety or because in practice it results in some inequality." *Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970) (quoting *Lindsley v. Natural Carbonic Gas Co.,* 220 U.S. 61, 78, 31 S.Ct. 337, 55 L.Ed. 369 (1911)). "A legislative enactment ... fails the rational basis test if 'the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [one] can only conclude that the legislature's actions were irrational.'" *Disabled Am. Veterans,* 962 F.2d at 142 (quoting *Vance v. Bradley,* 440 U.S. 93, 97, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979)). As the Supreme Court stated recently:

> In the ordinary case, a law will be sustained if it can be said to advance a legitimate government interest, even if the law seems unwise or works to the disadvantage of a particular group, or if the rationale for it seems tenuous.

*Romer v. Evans,* 517 U.S. 620, 632, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996).

Nonetheless, "the rational basis test is 'not a toothless one;' the classification scheme must 'advance[ ] a reasonable and identifiable government objective.'" *Greenstein by Horowitz v. Bane,* 833 F.Supp. 1054, 1075 (S.D.N.Y.1993) (quoting *Schweiker v. Wilson,* 450 U.S. 221, 234–35, 101 S.Ct. 1074, 67 L.Ed.2d 186 (1981) (quotation omitted)).

■ Equal protection claims under the Fifth Amendment are approached in the same way as claims under the Fourteenth Amendment. A court applying rational basis scrutiny to a statute must determine whether the law makes a cognizable classification, whether a legitimate governmental purpose supports the law, and whether the classification made is rationally related to a purpose of the law. *General Media Communications, Inc. v. Cohen,* 131 F.3d 273, 285 (2d Cir.1997), *cert. denied,* — U.S. ——, 118

S.Ct. 2367, 141 L.Ed.2d 736 (1998) (citations omitted).

■ The IPS on its face makes no classification. Nonetheless, just as "[s]tate actors may create classifications facially," they may also do so "de facto, through the enforcement of a facially neutral law in a manner so as to disparately impact a discernible group." *Johnson v. Rodriguez*, 110 F.3d 299, 306 (5th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 559, 139 L.Ed.2d 400 (1997). By issuing the same method for calculating reimbursement to all HHAs, the IPS does not visibly classify. However, the statute does create a de facto classification separating historically low cost, efficient HHAs from their less thrifty counterparts.

Plaintiffs allege that the low cost HHAs are generally public while the high cost agencies are generally private. *See Home Health Utilization Expands While Program Controls Deteriorate* at 2 (in 1993 proprietary HHAs averaged 78 visits per beneficiary per year, while voluntary and government HHAs averaged 46 visits). They contend that the per beneficiary limit singles out low cost agencies for inequitable reimbursement, which may be so inadequate as to force them to close.

The proposed individual Plaintiffs also allege a de facto classification whereby high care Medicare patients are disparately harmed. Since tending to such patients raises an agency's average per beneficiary cost, HHAs may endeavor to avoid accepting or reduce service to high care Medicare patients, in order to keep their average costs down. Vermont's HHAs would not be able to deny service. However, the individual Plaintiffs allege that if the HHAs closed or drastically reduced service, high care beneficiaries would be harmed the most and would be forced to enter institutional care.

Defendant claims that Plaintiffs establish not a classification but a disparate impact on low cost HHAs and high care Medicare patients, and that to prevail on a disparate impact claim under equal protection, Plaintiffs must prove that the IPS was ratified with a discriminatory purpose. HHS relies on *Johnson v. Rodriguez*, 110 F.3d at 306–07, in which the challenged law did not classify on its face but had a disparate impact on a racial minority.

*Johnson*, however, dealt with plaintiffs alleging a law's disparate impact on a suspect class. Second Circuit decisions have found that discriminatory purpose must be proven in disparate impact claims involving a suspect class, in order to justify strict scrutiny review. However, this Circuit has also held that the failure to prove discriminatory purpose does not doom the claim; it simply means that rational basis review will be applied. *See United States v. Moore*, 54 F.3d 92, 96 (2d Cir.1995); *Orange Lake Associates, Inc. v. Kirkpatrick*, 21 F.3d 1214, 1225–27 (2d Cir.1994) (where discriminatory intent is not proven for law with alleged disparate impact, law is reviewed as economic and social welfare legislation). Neither the HHAs nor the beneficiaries belong to a suspect class. Therefore, no question of discriminatory purpose arises because these parties from the outset are only entitled to rational basis review.

The IPS fulfills a legitimate Congressional purpose in its effort to reduce Medicare spending, waste, and HHA abuse. A legitimate purpose need not be specifically linked to the record underlying the act's passage, and need not in fact have motivated the legislative body. *General Media Communications*, 131 F.3d at 286 n. 16. All the same, the record behind the IPS indicates that it was implemented primarily as a method for halting the unchecked rise in Medicare home health spending until the arrival of the PPS. Traditionally even modest steps taken to control federal spending and provide savings against the budget deficit have been viewed as legitimate. *Disabled Am. Veterans*, 962 F.2d at 143.

Furthermore, these spending limits help to preserve Medicare funds specifically. Rising costs over the 1980's and 1990's led Congress to question whether the entire Medicare program could survive. Behind the IPS lay a legitimate governmental purpose of controlling Medicare home health spending.

Congress wields discretion over the expenditure of public funds. "Every desirable program cannot be funded, nor can the full

needs of every funded program be met. Lines must inevitably be drawn, and it is the legislature's province to draw them." *Brown v. Bowen*, 905 F.2d 632, 635 (2d Cir.1990).

As a result it is generally not the court's province to "judge the wisdom, fairness, or logic of legislative choices." *FCC v. Beach Communications*, 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993). Courts should not intrude on discretionary decisions of Congress to spend for the public welfare unless the choice made "is clearly wrong, a display of arbitrary power, not an exercise of judgment." *Bowen v. Owens*, 476 U.S. 340, 345, 106 S.Ct. 1881, 90 L.Ed.2d 316 (1986) (quoting *Mathews v. De Castro*, 429 U.S. 181, 185, 97 S.Ct. 431, 50 L.Ed.2d 389 (1976) (quotation omitted)).

This Court bears in mind, however, that rational basis review was not meant to be toothless. A rational relation to the legislative purpose should not be confused as synonymous with any relation. It must, in fact, be rational. Though this measure of scrutiny is often perceived of as a rubber stamp, the Supreme Court has invalidated legislation which it found to fail this test. *See, e.g., Romer*, 517 U.S. 620, 116 S.Ct. 1620 (striking down a Colorado constitutional amendment prohibiting specific protections for homosexuals).

Laws resulting in de facto classifications have also failed the rational basis test. In *Allegheny Pittsburgh Coal Co. v. County Comm'n of Webster County*, 488 U.S. 336, 109 S.Ct. 633, 102 L.Ed.2d 688 (1989), a county's property tax assessment scheme was struck down as unconstitutional. The scheme assessed all property based on its most recent purchase price, making modifications for land which had not been sold recently. The modifications failed to prevent gross disparities in assessed value. Recently sold properties were taxed at 8 to 35 times the rate of comparable properties, and the

modifications did not alleviate these disparities over a ten-year period. *Id.* at 344, 109 S.Ct. 633. Though this equal protection claim was not typical, in that the challenged law did not facially regulate a class or a right, the Court acknowledged the propriety of this "comparative" complaint. *Id.* at 342, 109 S.Ct. 633. The Court held that this scheme could not stand when its modifications were insufficiently frequent and accurate to remedy the disparities. *Id.* at 343–44, 109 S.Ct. 633.

As in *Allegheny Pittsburgh Coal*, the HHAs and beneficiaries here bring a comparative complaint. They charge that the IPS constructs a de facto classification. According to Plaintiffs, gross disparities produced by this law reward certain agencies for their inefficiency in 1994, and allow them to amass more reimbursement than they need.[2] Meanwhile, efficient HHAs with historically prudent spending will struggle to recoup their costs of service, which have traditionally dwarfed those of their extravagant counterparts. Furthermore, by not accounting for case mix the IPS frustrates those HHAs serving proportionally more high care patients now, and rewards those who have managed to reduce their share of such patients. The future of efficient HHAs is jeopardized by the imposition of these cost-cutting measures on those agencies with little fat to trim. If competing agencies were allowed to enter Vermont's marketplace, they might have greater per beneficiary limits and thus an advantage in serving patients, at the expense of the network of nonprofit agencies. These potential repercussions do not lend a rational air to the IPS.

Another troubling signal stems from the per beneficiary limit offered to new agencies. HHAs without 1994 spending figures will be accorded the average of the spending of other agencies in that year. It appears that this figure will range between $3300 and $3600.

---

2. *See Medicare Home Health Care* at 44 (statement of Michael Mangano, Principal Deputy Inspector General, HHS) (cautioning Congress not to "grandfather in these skyrocketing utilization experiences that we are seeing in health agencies across the country"); William J. Scanlon, General Accounting Office, *Success of Balanced Budget Act Cost Controls Depends on Effective and Time-* *ly Implementation* 4 (1997) (statement before the Subcomm. on Oversight and Investigations of the House Comm. on Commerce) ("[T]he number of visits per beneficiary had already more than doubled by 1994 from that in 1989, so the per-beneficiary limits will be based on historically high visit levels").

"Per-patient caps pack more nasty surprises for industry than expected," *Home Health Line,* April 6, 1998, at 1 ($3357); VAHHA, *Impact Analysis of Beneficiary Cap Based on Last Completed Fiscal Year* (Ex. to June 1, 1998 hearing) ($3375 or $3604). The per beneficiary cap for Vermont's HHAs based on their 1994 utilization will range from $2223—$3687. VAHHA, *Impact Analysis.* Under the IPS, then, it would serve the interests of several Vermont HHAs to dissolve, and for the principals involved to form an entirely new agency entitled to a greater per beneficiary limit.[3] These curious incentives, along with the aforementioned factors, give the Court pause in deeming the IPS rational.

However, ultimately this interim scheme is rationally related to the goal of saving Medicare funds. Though there may be several methods of temporarily holding down home health costs which would be fairer, the IPS is one rational solution. The per beneficiary limit does restrict reimbursement for each agency, though some obtain much larger spending allowances than others. While the 1994 base limit does not eliminate all overutilization, it forces HHAs to forfeit the excesses of the last five years.

Most importantly, the IPS is exactly what its title indicates—an interim measure. Unlike the assessment scheme in *Allegheny Pittsburgh Coal,* the disparities created by the IPS will not survive for ten years. The PPS is slated to arrive in 1999. Bruce Vladeck, Administrator of the HCFA, pointed out in Congressional testimony the advantage of a simple though imperfect IPS: "[M]aking huge changes to our current payment system in the interim could divert resources away from the development of a reliable PPS, and toward the implementation and maintenance of an unwieldy and unreliable interim system." *Medicare Home Health Care* at 17. Vladeck acknowledged the potential harm to those agencies with more high care patients than in 1994, and the possible incentive to avoid accepting such cases. Nevertheless, he testified, "[O]ver a

*short period of time,* given the base from which we are starting, we think that's a relatively modest risk." *Id.* at 42 (emphasis added). The rationality of the IPS gathers strength from the knowledge that its lifespan will be brief. Significant constitutional infirmities would emerge were the IPS to last indefinitely or to become a permanent scheme.

Several bills are currently pending before Congress to amend or delay implementation of the IPS. *See, e.g.,* S.1993, 105th Cong. (1998); H.R. 3567, 105th Cong. (1998). The appearance of these bills shows how controversial and perhaps misguided passage of the IPS may have been. This legislative movement also exemplifies why rational basis review of such laws tends toward deference: "the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes." *Cleburne,* 473 U.S. at 440, 105 S.Ct. 3249.

### 2. *Substantive Due Process*

 Substantive due process under the Fifth Amendment bars certain arbitrary, wrongful government actions regardless of their procedural fairness. *Conway v. Searles,* 954 F.Supp. 756, 770 (D.Vt.1997). The complainant bears the burden of showing that the legislature, in passing the challenged law, acted in an arbitrary, irrational manner. *Conway v. Sorrell,* 894 F.Supp. 794, 803 (D.Vt.1995). A plaintiff setting forth a substantive due process claim must show that the government unlawfully interfered with an identified property interest. *Interboro Institute, Inc. v. Maurer,* 956 F.Supp. 188, 196 (N.D.N.Y.1997).

 The HHAs assert a property interest in their continued participation as providers in the Medicare program. Possession of a property interest in a government benefit requires more than "an abstract need or desire for it;" there must be "a legitimate claim of entitlement to it." *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) (addressing procedural due process claim).

---

**3.** The IPS does not allow the per beneficiary limit for new agencies to apply to those HHAs that have simply altered their corporate structure or name since 1994. H.R.Rep. No. 105–149 at *1024, 1514.

At one time the Second Circuit appeared to recognize a property interest in continued participation in the Medicare and Medicaid programs; *see Patchogue Nursing Ctr. v. Bowen,* 797 F.2d 1137, 1144–45 (2d Cir.1986). The Circuit's viewpoint has since shifted. In *Plaza Health Laboratories, Inc. v. Perales,* 878 F.2d 577 (2d Cir.1989), the Circuit recognized the existence of statutory provisions extending significant discretion to the State government over the bestowal and/or continuation of a government benefit. This discretion suggested that no entitlement to that benefit existed. *Id.* at 581; *see also Interboro Institute,* 956 F.Supp. at 197 (if significant discretion exists in government conferral of a benefit, recipient holds no property interest).

Other courts have been reluctant to find a property interest in providers' continued participation in Medicare or Medicaid programs. *See Gellman v. Sullivan,* 758 F.Supp. 830, 833 (E.D.N.Y.1991); *Painter v. Shalala,* 97 F.3d 1351, 1358 (10th Cir.1996) (physician providing Part B Medicare services possesses no property interest in the manner in which reimbursement payments are calculated; physician knew the payment schedule and could have chosen not to provide such services). In addition, any such property interest would more likely be found in the provider's ability to participate than in a particular method of reimbursement. Here, Defendant does not attempt to bar Plaintiffs from participating in Medicare.

Without a valid property interest, the substantive due process claim cannot succeed. Even if a valid property interest were shown by the HHAs, this claim would be legally deficient. As the IPS does not regulate a suspect class or interfere with a fundamental right, the scheme survives if it is found not arbitrary and rationally related to a legitimate governmental purpose. *Searles,* 954 F.Supp. at 770. To be struck down the statute must exhibit "a patently arbitrary classification, utterly lacking in rational justification." *Flemming v. Nestor,* 363 U.S. 603, 611, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960). As with rational basis review of equal protection claims, the legislation need not be perfectly tailored, and the Court should not indulge in speculation as to whether the law could have been better conceived. *Beatie v. City of New York,* 123 F.3d 707, 712 (2d Cir.1997).

In this case, the Court's finding that the IPS was rationally related to a legitimate governmental purpose under equal protection review would apply in the substantive due process arena as well. "Equal protection and substantive due process are of course analytically distinct concepts, but the outcome under both analyses is the same in this case." *Searles,* 954 F.Supp. at 772.

The Supreme Court has not invalidated federal economic regulation on substantive due process grounds since 1935. *See LTV Steel Co. v. Shalala (In re Chateaugay Corp.),* 53 F.3d 478, 487 (2d Cir.1995). Though flawed, the IPS is rationally related to the purpose of reducing Medicare home health spending. Congress rationally justified the IPS, given the marked increase in HHA expenditures and the fact that they did "not face any meaningful constraint on total reimbursement." H.R.Rep. No. 105–149 at *2850–51. As a result, even if a valid property interest were established, the IPS would survive a substantive due process challenge.

### 3. *Takings Clause*

■ Plaintiffs accuse the IPS of limiting their reimbursement to such an inadequate level as to constitute a regulatory taking. "A regulatory taking exists if a government regulation of property 'goes too far,' such that its effect is a total or near-total deprivation of the owner's interest in the subject matter." *Hinesburg Sand & Gravel, Co., Inc. v. Chittenden Solid Waste District,* 959 F.Supp. 652, 657 (D.Vt.1997), *citing Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322 (1922), *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984).

■ There is no "set formula" for determining when a regulatory taking has occurred. *Penn Central Transp. Co. v. City of New York,* 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). Whether the government's failure to compensate parties for losses incurred by a regulation will render that

regulation invalid hinges largely on the particular circumstances of the case. *Id.* The "ad-hoc, factual inquir[y]" into the claim, *id.*, is guided by three factors: the economic impact of the regulation, the extent to which it interferes with distinct investment-backed expectations, and the character of the governmental action. *Kaiser Aetna v. United States*, 444 U.S. 164, 175, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979).

Before turning to these factors, the Court evaluates whether the HHAs and beneficiaries must locate a property interest to support their allegations. The Second Circuit has found that takings claimants do not have a property interest in prospective Medicaid reimbursement rates. *Oberlander v. Perales*, 740 F.2d 116, 120 (2d Cir.1984); *Grossman v. Axelrod*, 646 F.2d 768, 771 (2d Cir. 1981). The Southern District of New York has recognized a provider's property interest in reimbursement under Medicare Part B for services already rendered. *Furlong v. Shalala*, 1996 WL 393526, No. 94–4817 at *12 (S.D.N.Y. July 12, 1996).

Recent Supreme Court jurisprudence casts doubt on whether a plaintiff must specify an identified property interest at all in a regulatory takings claim. *Eastern Enterprises v. Apfel*, —— U.S. ——, ——, 118 S.Ct. 2131, 2154–56, 141 L.Ed.2d 451 (1998) (Kennedy, J., concurring in the judgment and dissenting in part). Though the plurality opinion made no explicit announcement in that case, Justice Kennedy believed that the plurality had found a taking despite the lack of an identified property interest at stake. This result departed from precedent: "As the range of governmental conduct subjected to takings analysis has expanded ... we have been careful not to lose sight of the importance of identifying the property allegedly taken, lest all governmental action be subjected to [takings scrutiny]." *Id.* at ——, 118 S.Ct. at 2156 (Kennedy, J.).

*Eastern Enterprises* leaves the necessity of an identified property interest in doubt. Since this issue need not be decided to dispose of the takings claim, the Court assumes for the purposes of the motion to dismiss that the HHAs and the beneficiaries have identified a property interest at stake.

The Court's inquiry need not extend beyond the character of the governmental action. For a regulation to exceed constitutional bounds, it must create a legal compulsion over the claimants. *Hinesburg Sand*, 959 F.Supp. at 657. The IPS lacks the necessary legal compulsion over Plaintiffs to constitute a taking. The Second Circuit found no legal compulsion in Medicare price regulations applicable to anesthesiologists, in *Garelick v. Sullivan*, 987 F.2d 913 (2d Cir.1993). Though the regulations limited how much the plaintiff doctors could charge, this Circuit found no taking since provider participation in Medicare is voluntary. *Id.* at 917. *See also Whitney v. Heckler*, 780 F.2d 963 (11th Cir.1986) (temporary freeze on providers' actual charges to Medicare patients did not constitute a taking; plaintiffs were not required to treat Medicare patients); *Good Samaritan Medical Center v. Heckler*, 605 F.Supp. 19 (S.D.Ohio 1984) (as providers' involvement in Medicare is voluntary, reduced compensation is not a taking). *Cf. Methodist Hospitals v. Indiana Family & Social Services*, 860 F.Supp. 1309 (N.D.Ind.1994) (hospital had standing and factual basis for trial on taking with regard to state's new Medicaid emergency care reimbursement rates; hospital's emergency room was compelled to treat all individuals, including Medicare patients).

Not unlike this case, in *Garelick* the anesthesiologists pointed to their unique situation, alleging that New York law compelled them to serve Medicare patients and that the economic hardship of the limits amounted to compulsion. *Garelick*, 987 F.2d at 916–17. The Second Circuit rejected these arguments. First, regardless of whether the state health care structure required the plaintiffs to treat Medicare beneficiaries, no *federal* compulsion existed. *Id.* at 917. Second, although the price regulation applied to hospital work, which constituted the bulk of the anesthesiologists' practice, the anesthesiologists were not compelled to work in hospitals. Even if they could not remain economically viable without doing so, economic hardship did not equal legal compulsion. *Id.*

Similarly here, the character of the governmental action does not amount to a tak-

ing. The IPS limits reimbursement under Medicare, a program in which providers opt to participate. The fact that the State of Vermont has devised a scheme whereby the HHAs could not retreat from serving Medicare beneficiaries does not render the federal statute compulsory. In Vermont, to treat only non-Medicare patients may spell financial ruin for an agency, as a substantial percentage of home health care beneficiaries are Medicare recipients. Nonetheless, an action causing financial hardship is not necessarily compulsory.

The character of this governmental action also warrants dismissal of the beneficiaries' takings claim. The IPS does not compel the beneficiaries any more than it does their providers. The new limits restrict HHA spending but do not on their face prevent beneficiaries from receiving the medically necessary services to which they are entitled. Any alleged compulsion of Medicare patients into institutional care caused by the closure of a Vermont HHA would result from a state regulatory scheme allowing only one HHA in each region, not a federal shift in how home health providers are reimbursed.

In sum, the IPS is not the type of governmental act that violates the Takings Clause. See *Eastern Enterprises*, ⎯ U.S. at ⎯, 118 S.Ct. at 2155–56 (Kennedy, J.) ("the mechanism by which the Government injures [plaintiff] is so unlike the act of taking specific property that it is incongruous to call the [statute] a taking, even as that concept has been expanded by the regulatory takings principle").

#### 4. *Tenth Amendment*

■ The Tenth Amendment provides that "powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." Plaintiffs submit that the IPS violates the Tenth Amendment by interfering with the State of Vermont's carefully structured network of HHAs offering home health care to all Vermonters in need of such services. The State franchises this group of regional, locally supported, nonprofit agencies to cover Vermont's home health needs at a low cost. The

per beneficiary limit is accused of impeding the State's system, since it may force these historically efficient HHA's to close.

Before reaching the viability of a Tenth Amendment claim, Plaintiffs' standing must be addressed. HHS maintains that the HHAs allege no injury in fact. There can be no "invasion of a legally protected interest," *Defenders of Wildlife*, 504 U.S. at 560, 112 S.Ct. 2130, because the Tenth Amendment protects only States, not private parties.

The Supreme Court, in *Tennessee Electric Power Co. v. Tennessee Valley Authority*, 306 U.S. 118, 144, 59 S.Ct. 366, 83 L.Ed. 543 (1939), held that a group of litigants counting no States or state officers among them lacked standing to raise a Tenth Amendment claim. This decision has not been reversed, though a couple of more recent federal cases have granted standing to private parties without confronting *Tennessee Electric*. *See, e.g., Metrolina Family Practice Group, P.A. v. Sullivan*, 767 F.Supp. 1314 (W.D.N.C. 1989), *aff'd* 929 F.2d 693 (4th Cir.1991) (permitting group of physicians to challenge Social Security Act's ceilings on certain Medicare charges).

■ The Second Circuit extends Tenth Amendment standing to include municipalities or their arms, to the extent they have been delegated sovereign powers by the State. When the federal government unduly interferes with the functioning of such local bodies, standing is properly found regardless of whether the State joins in the claim. *Friends of the Earth v. Carey*, 552 F.2d 25, 33–34 (2d Cir.1977). This standard was reinforced in *Frank v. United States*, 78 F.3d 815 (2d Cir.1996), *rev'd on other grounds* ⎯ U.S. ⎯, 117 S.Ct. 2501, 138 L.Ed.2d 1007 (1997), *on remand* 129 F.3d 273; to include a County sheriff. The Circuit found that the challenged federal statute imposed enough administrative burdens to justify standing. *Id.* at 823. In addition, the Circuit noted that federalist provisions such as the Tenth Amendment existed to protect both the States and the liberty of individual citizens from an excessive concentration of power in a central government. *Id.* at 825.

The Second Circuit in *Frank* did not speak to whether private parties were also eligible to raise Tenth Amendment claims. While the Tenth Amendment protects individual liberty, the Second Circuit has not extended Tenth Amendment standing to all private parties. Only those arms of state or local government with delegated State sovereign powers have been approved as claimants. The HHAs comprise a network of State-certified home health care providers. Nevertheless, the HHAs are not State administrative bodies but nonprofit organizations governed and funded locally.

Furthermore, in *Carey* and *Frank* relief was sought based on the administrative burdens created by the challenged law. Here, Plaintiffs do not allege an imposition on any delegated sovereign powers. Rather, they invoke the Tenth Amendment on behalf of the State of Vermont, alleging that the IPS stymies Vermont's health care policy. Any injury to Plaintiffs is a by-product, not a direct result, of a Tenth Amendment concern. The State of Vermont has filed an amicus curiae brief supporting Plaintiffs but does not join in this lawsuit. Though the Second Circuit has relaxed standing requirements somewhat, the Circuit has only approved of private parties claiming a violation of their delegated powers. Private parties here sue the HHS for violating the State of Vermont's sovereignty. The necessary standing to bring this Tenth Amendment claim is therefore absent.

The State of Vermont agreed with Plaintiffs that the per beneficiary limit of the IPS is "irrational and intolerably inequitable" (Paper 22 at 11), and that while the State is committed to deficit reduction, Vermont "will not stand for her citizens being treated unjustly." (Paper 22 at 6.) However, Vermont did not elect to stand with Plaintiffs and join this lawsuit. The Court is not indicating that the Tenth Amendment claim would or would not have survived had the State done so. Still, the Court finds it curious that the State, which alleges substantial detriment to its health care system and its elderly by the passage of the IPS, did not see fit to join Plaintiffs and bolster the Tenth Amendment claim.

### D. *Motion for Preliminary Injunction*

As Plaintiffs fail to state a claim on any of their counts, their motion for a preliminary injunction must be denied as moot.

### III. *Conclusion*

Vermont's thirteen Medicare-certified home health agencies provide essential health care services to thousands of citizens of this state. The position these agencies occupy enables Vermonters to receive care outside the hospital setting, achieving significant savings for taxpayers. Interagency assistance and a nonprofit framework produce an extraordinarily efficient, cost effective arrangement for the provision of home health services. Traditionally Vermont's agencies have incurred strikingly low per patient costs, especially when compared to for-profit HHAs in other states. In addition to their financial benefits these agencies satisfy the preferences of elderly patients, who increasingly wish to be cared for at home, and the State of Vermont, which seeks fewer nursing home beds and greater home health services under its health care policy.

The BBA has instituted a reimbursement scheme that imperils Vermont's nonprofit HHAs and the state health care system that fostered their development. The per beneficiary limit based on 1994 figures arguably will coddle historically wasteful HHAs, while frustrating those that worked efficiently at that time. The IPS threatens to cripple the financial state of these Medicare-certified HHAs. If one or more agencies close due to debt, elderly Medicare beneficiaries will be forced to choose between purchasing their own home health services (if they are able), forgoing such treatment, and entering institutional care.

The Court is clearly troubled by the impact of its decision on the State of Vermont's health care policy, its home health agencies, and the Medicare beneficiaries they serve. However, courts must constantly be wary when asked to invalidate legislative decisions, to guard against substituting their own preferences for the will of the American people's elected representatives. The constitutional claims raised in this case are governed by

standards that command judicial deference to the will of Congress. Judicial interference is particularly unwarranted where, as here, the decision is essentially a political one. Despite its inadequacies and its potential to harm some innocent HHAs, the IPS represents a sufficiently rational attempt by Congress to curb nationwide excesses in Medicare spending on home health services and HHA fraud. The law's rationality is also predicated on its temporary nature, as the PPS is scheduled to take effect on October 1, 1999. For those reasons, Plaintiffs' claims must fail.

Accordingly, Defendant's Motion to Dismiss (Paper 18) is GRANTED, Plaintiffs' Motion for Preliminary Injunction (Paper 2) is DENIED as moot, and Plaintiffs' Motion to Amend (Paper 24) is DENIED as moot.